[File No. 6405.]

FRANK BROCK and William Brock, Respondents, v. PAULINE NOECKER, Julia Latt, Caroline Lettenmaier, Pauline Noecker as Executrix of the Last Will and Testament of Julia Brock, Deceased, and Ida Munz, Appellants.

MARTIN BROCK, Respondent.

(267 N. W. 656.)

Opinion filed June 13, 1936.

*Hanchetl, Sproul & Sad,* for appellants.

*A. P. Paulson & William R. Pearce,* and *C. E. Peterson,* for respondents.

Burr, J. In this action Frank Brock seeks to compel Pauline Noecker, as executrix of the last will and testament of Julia Brock deceased, to convey to him in fee simple one hundred and twenty acres of land, the property of Julia Brock. As a basis for this demand he shows that Julia Brock was his mother; that William Brock and Martin Brock are his brothers and the remaining parties are his sisters; that in 1915 he was engaged to be married and planned to erect buildings on farm lands owned by him and adjoining the lands in dispute and thereupon an agreement and contract was made between him and his mother to the effect that "in consideration of his staying at home on said premises above described, assuming the control and management and responsibilities of running said farm, cropping the said farm and doing all that would be necessary to run the said farm in a good and husbandlike manner, and deliver to the said Julia Brock a certain share of the crop raised each year for her maintenance, and make available to the said Julia Brock a home on said premises at any time and as long during her natural life as she should desire to remain there, that she, the said Julia Brock, would convey said premises above described

to the said Frank Brock, by deed or will, free and clear of all liens and incumbrances, absolutely and forever."

Frank Brock claims that he fulfilled this contract but that his mother "in her lifetime, failed and neglected to convey said premises to the said Frank Brock by deed of conveyance; that in or about the year 1917 the said Julia Brock made a last Will and Testament in which she did convey said premises to said Frank Brock, pursuant to said contract and agreement, but that said Will and Testament has been lost and cannot be found."

The defendants deny that any such contract was ever entered into; or that Frank made a home on the farm available for his mother as long as she desired to remain there or relieved her of responsibility and care in the management of the farm. They further allege that if there was any such agreement made between Frank and his mother, it was never fully performed; and further that whatever agreement there was between him and his mother was mutually rescinded in October 1922 and thereafter Frank Brock proceeded to work the farm as a tenant of his mother; that whatever improvements he made on the place were made from proceeds of the farm belonging to his mother; and that since October 1922 he paid no taxes on the premises and made no improvements thereon. They further allege that if the mother at any time made a will wherein she devised this property to her son Frank, she afterwards revoked that will and by will left said property to William Brock and to the defendants other than Martin, share and share alike. They further allege that there was no valuable or adequate consideration given by Frank Brock for any agreement which he may have made with his mother relative to the title to the land, and that if he has any claim against his mother or her estate the same is "capable of pecuniary valuation, and plaintiff has an adequate remedy at law for his recovery. . . ."

The trial court found in favor of the plaintiff Frank Brock and judgment was entered decreeing that he was entitled to specific performance of the agreement free from any and all claims of the estate of his mother or of any of the other parties to the action, and any provision made in the will of Julia Brock, being now probated, leaving to any of the other parties any interest in this land is null and void. From this judgment the defendants appeal demanding a trial de novo.

There are twenty-eight specifications of error, but it is not necessary to pass upon them seriatim. As appellants state, there are three main issues:

"(1) Did Julia Brock, clearly and definitely, orally promise to deed or will to Frank Brock the $N\frac{1}{2}$ of $SE\frac{1}{4}$ and $SW\frac{1}{4}$ of $SE\frac{1}{4}$ of Sec. 30, Twp. 140, Range 59, Barnes County, North Dakota?

"(2) If there was an oral agreement between Julia Brock and Frank Brock embodying a clear and definite promise on the part of Julia Brock to convey, was such agreement based on an adequate consideration, fair and just, and executed and performed on the part of Frank Brock so as to entitle him to a decree of specific performance?

"(3) If such agreement existed, was it mutually rescinded by the parties during the lifetime of Julia Brock?"

The father, Gustaf Brock, died in 1914, when Frank was about twenty-five years of age. There were three sons, William, Martin, and Frank, and four daughters in the family. At the time of the father's death William was settled, Martin and two of his sisters were married, and Martin got his own farm in the spring of 1915. Shortly before the father's death the father and mother discussed the future of Frank, the youngest son, and told him that if he would stay home and take care of them and of the home farm it would be his when they died. The father died before final arrangements were made; but shortly after the father's death the mother made such contract with Frank. On several occasions, to several people, she stated in effect, "Frank is to stay with me, and when I die he is to get the home." The brothers and sisters knew of this arrangement, it was discussed among them, and no one made objections to it.

We find, therefore, that in 1915 his mother made an agreement with him that if he would remain on the farm and operate it and give her a comfortable home thereon with the necessary support, she would will the "home place" to him so that it would become his at the time of her death. She did not agree to give him the land in præsenti. She retained title in the land as her own but agreed to leave it to him upon her death, and in 1915, in pursuance of such agreement, made a will wherein she left this home place to Frank, to be his at the time of her death. Frank knew of this provision at the time the will was made. A copy of the will was filed with the county court and a copy delivered

to the mother and kept for her by Frank with other of her papers. Frank never knew of any other will until three or four days after his mother's funeral, and there is nothing to show he knew the first will had been destroyed. The trial court so found, and while we try the case de novo and from our own independent judgment upon the facts, yet we give appreciable weight to the decision of the trial court upon the facts. Independent of this, however, it is clear the mother made such an agreement and that under that agreement Frank remained on the farm, furnished her a comfortable home, and operated the farm in a good manner.

The evidence is quite conclusive that such an agreement was "based on an adequate consideration, fair and just," and we so hold.

From the record it is clear the rights of the parties depend entirely upon the question of whether there was a mutual rescission of this agreement made between Frank and his mother.

The two daughters who were at home at the time of the father's death married, leaving Frank and the mother on the home place. Each of these daughters had a forty-acre tract from their father which Frank bought from them. He also bought from a neighbor an eighty-acre tract adjacent to the home place. Frank lived with his mother and managed all of her property, as well as what he had bought for himself. The testimony shows he was a good farmer. He handled the crops the same as if they were his own. While the two girls remained at home they worked. The family was industrious and thrifty. When money was needed for support, clothing, etc., it was furnished by Frank from the proceeds of the farm. He paid the taxes, built a barn, and made other improvements on the home place worth two thousand dollars, which came from the proceeds of the farm and his own place. In 1919 he married and brought his wife to the home. The mother had her own room, her own furniture. There is no contention that she was not comfortable and did not have all of the money she desired.

In 1917 the mother conveyed to Frank all of her horses, cattle, and machinery, the value of which was variously estimated up to two thousand dollars ($2,000).

Some friction arose between the mother and the daughter-in-law— little irritations which grew and magnified. The manner of house-

keeping and the rules of thrift employed by the daughter-in-law were such that the mother-in-law criticized, as she did the housekeeping of another daughter-in-law. There is no contention of ill treatment by Frank nor any dissension between him and his mother at that time; but the mother left the home in 1922 and went to live with her daughter, Mrs. Latt, who lived in the same neighborhood. When the mother went to her daughter's home, Frank went over to see her. There was some angry dispute between Frank and Mr. and Mrs. Latt, and the upshot was that Frank stated if one could not get along with his wife, they could not get along with him; that it might be better for him to leave entirely; and that he could get another place. His wife offered to leave, but the mother vetoed both suggestions and wanted Frank to remain upon the home place. After some conference Frank stated that it would be better for all concerned and squarer to have a lease drawn up, and so Exhibit D. was executed, whereby Frank leased, not only the home place, but the rest of the land from his mother, upon a crop-sharing contract wherein the mother was to get half of the crop, furnish the seed, and pay half of the threshing expenses. The lease contained the usual printed provisions found in such contracts, such as that Frank was not to underlet the premises or assign the lease without the consent of his mother and that at the expiration of the term he would "quietly yield and surrender the aforesaid premises" to her. Apparently there was but one written lease drawn, and the time of expiration was fixed as October 1, 1923.

Frank continued on the place until the present day. The mother died in 1934. Each year Frank gave her half of the crop. He hauled her share to the elevator or such other place as she desired, and received the use of her pasture land in lieu thereof. The mother paid the taxes, and Frank made some little improvements on the place. He put up some fencing and built a garage and a brooder house.

Shortly after the mother left she sent to Frank for her papers, which were delivered to her by Frank, including the copy of the will. She also withdrew from the county court the duplicate on file there. Both copies were destroyed, and later the mother proceeded to make another will wherein she cut off Frank and Martin from sharing in her estate, with a legacy of $5 or $10 each. After providing a substantial legacy for Julia Latt, she provided that the rest of her estate, real and

personal, should be divided equally among her son William and the four daughters. Some time later she made a third will, similar in all respects to the terms of the second except that she gave to Martin and to Frank each a legacy of $100.

Upon his mother's death this third will was filed with the county court and admitted to probate, Pauline Noecker qualifying as executrix. After conference with her counsel, Frank farmed the premises on the same terms as were contained in Exhibit D.

In the inventory of this estate all of the land owned by the mother was listed as part of her estate, including this home farm. Frank filed a written protest against the inclusion of this one hundred and twenty acres in the estate of his mother and set forth his reasons therefor. The refusal to recognize his claim caused this lawsuit.

The argument of silence is presented. It is said that at the time the question of the lease was being discussed Frank made no statement or reference to any right to this one hundred and twenty acres, and it is argued that this is indicative of the fact that when he entered into the contract known as the lease he must have intended a rescission of the contract with his mother. But it must be observed that the mother made no statement of any desire or intent to rescind her part of the agreement. She said nothing about canceling that contract. No one was discussing that. The title to the land was still in her. She was not holding it in trust for Frank. She had not given it to him and did not hold the title for him. She had contracted to will it to him. She made no suggestion to him that she would change her will, and there is nothing to indicate that Frank ever knew she changed her will. He had a right to assume that the original agreement was still in existence—that is, that when she died she would will him the one hundred and twenty acres. The agreement he was making with her now was such as was forced by the situation. The mother had left the home of her own volition. No good reason for leaving was shown. She could have come back at any time. Her room was kept for her, though in after years it does show that at times it was rented to school teachers. The agreement with him was to furnish her a comfortable home and support. While this implied furnishing it in this house, yet he could not compel her to stay there. When she left, his obligation to support her remained; but she was no longer living

with him at his table and under his care. Standing alone the lease might be considered to be a mere transaction between landlord and tenant; but taking it in the light of the facts of the case it must be clear that the view of the trial court is the correct one. The trial court held in effect that this was merely a method of determining what would be a fair understanding with her as to what was necessary for support. It is true this was not so stated definitely; but it is clear the mother received more this way than she would otherwise, for at the time of her death she had money saved up. The inventory showed this amounted to nine hundred dollars ($900). In all talk with the mother after she left there was no intimation on her part to Frank that there was any change in the agreement or that she considered the agreement at an end. Indeed, Mrs. Latt, who took her mother to the lawyer's office for the purpose of drafting the second and third wills, when asked, "Didn't your mother tell you . . . in the last will she made she did not intend to change the contract with Frank under the first will at all?" answered, "Yes, she did." She was then asked, "Told you that?" and she said, "Yes."

We must remember that for eight years Frank carried out his agreement, apparently to the entire satisfaction of the mother. He was willing to continue it, and for twelve more years he gave her half of the crops. He was renting from her land that was not involved in this agreement and so a lease was necessary, and although the lease describes her as the owner of the land, this is no concession on his part because, as a matter of fact, she was the owner of the land and was to remain owner of the land until her death. It was her land. Her contract was to will it to him.

We must remember the parties involved are not supposed to be experienced in law, and we determine their motives and intents from a consideration of the entire case. There was no room in the home for two mistresses—whatever may have been the causes of difference. Frank was torn between two emotions—his loyalty to his mother and his loyalty to his wife. He recognized his duty to his mother. He could not maintain her in his own home for she would not stay there, and so he did the best thing possible. We are constrained to believe that his execution of the lease was not a rescission of the original contract, nor was it intended as such. It was a suggestion on the part of

Frank as the best way to avoid difficulties in the future. We arrive at the same conclusion as the trial court did—that there was no rescission.

A will executed under an agreement such as the one shown here is both contractual and testamentary. Its contractual features cannot be later revoked by the testator without the consent of the beneficiary. See Torgerson v. Hauge, 34 N. D. 646, 159 N. W. 6, 3 A.L.R. 164. Ample authority for this principle of law is set forth in the case cited.

That the mother destroyed the first will and with her daughter, Mrs. Latt, visited lawyers for the purpose of drawing a new one is well established; but no notice of change of purpose seems to have been given Frank. He was utterly ignorant of it until after his mother's funeral. He did not repudiate his obligations nor break his engagements.

In Goodwin v. Casselman, 51 N. D. 543, 200 N. W. 94, we stated law applicable to the situation here.

"Where a will is made pursuant to a contract for support, in which the party to furnish the support is made the beneficiary, and where such party had entered upon the performance in the manner contemplated and has not repudiated or broken his obligations, the will may not be revoked so as to deprive him of his contract rights."

In the case at bar there is no attempt to prevent the probate of the third will; but demand is made that during the probate of this will his contractual rights with reference to the land involved be respected; and that so far as the provisions of the will are in conflict therewith, such provisions be modified. Nowhere in the will is there a specified devise of this one hundred and twenty acres to anyone. The will, after making provision for certain legacies, provides that all of the rest of the estate, real and personal, be given to William and the four sisters. If Mrs. Latt be correct and the mother did not intend to change her contract with Frank, there would still be real estate to devise. The issue involved here merely affects the acreage of such real estate.

In the specifications of error reference is made to alleged errors in the admission of testimony, particularly as to the qualifications of the witness Paulson who drew the first will as the lawyer for the mother, and of Frank himself in testifying as a witness in his own be-

half in a case against an executrix, when not called by the latter. We need not review these specifications as we determine that independent of these sources there is ample evidence to sustain the matters regarding which these witnesses testify. The other specifications of error have been examined, and we find nothing reversible therein. The judgment, therefore, is affirmed.

BURKE, Ch. J., and NUESSLE, MORRIS and CHRISTIANSON, JJ., concur.