[File No. 6945]

DORETTE HAGEROTT, Appellant, v. IDA DAVIS
and ELWOOD DAVIS, Respondents.

(17 NW(2d) 15)

Opinion filed December 28, 1944

*C. F. Kelsch,* for appellant.

*Cox, Cox & Pearce,* for respondents.

Burr, J. For some time prior to 1923, Ernst Hagerott was the owner of a large number of quarter sections of land in this state including the east half of section 31, township 140, range 82, in Morton County, North Dakota—the property in issue here. His family consisted of his wife, the plaintiff, three sons, and six daughters including Ida Davis, the defendant herein. At that time, three of the daughters—Rose, Emma, and Alma—were married.

January 9, 1923, Ernst Hagerott, hereafter called the father, made a will, the important provisions being:

"Second: "I give, bequeath and devise to may beloved wife, Dorette Hagerott, all my real and personal property of every name, nature, kind and description.

"Third: For the reason that I have heretofore given and transferred to my sons, Walter Hagerott of Mandan, North Dakota, and Henry H. Hagerott of Center, North Dakota, and to my daughter, Rosy, now

Mrs. Rosy Corders, of Center, North Dakota, certain valuable properties, I give and bequeath to them no part of the real or personal property belonging to me at my demise. To my sons, Walter and Henry, and to my daughter, Rosy, I leave the remembrance of my deepest love and affection.

"Fourth: To my son, George Hagerott of Mandan, North Dakota, and to my daughter, Emma Hagerott, now Mrs. Emma Bartrum, of Center, North Dakota, and to my daughter, Alma, now Mrs. Alma Pelkey, of Bismarck, North Dakota, and to my daughters Ida, Alice and Annie of Mandan, North Dakota, I give and bequeath no part of the real or personal property belonging to me at my demise, as I have every trust and confidence that my good wife, Dorette, will care and provide for them properly out of the property she may have at her demise. To my son George, and to my daughters Emma, Alma, Ida, Alice and Annie I leave the remembrance of my fondest love and affection."

The father died in August, 1938. The mother as executrix and heir began probate proceeding and the will was admitted to probate, the defendant Ida Davis being made a party to the proceedings. The inventory set forth this land involved as part of real property of the estate. The county court, in the final decree of distribution, entered and recorded April 15, 1943, described this land as being part of the estate of the decedent together with other real estate, and

"assigned to and vested in the said Dorette Hagerott as the sole devisee and legatee of the Last Will and Testament of Ernst Hagerott, deceased, forever, in the following proportions, to-wit:

"(1) All the right, title, interest, and estate of Ernst Hagerott, deceased, in and to all of the above described real property in fee simple forever.

"(2) All the right, title, interest, and estate of Ernst Hagerott, deceased, in and to all of the above described personal property as her sole personal property forever.

"To have and to hold the same, Together with all the hereditaments and appurtenances thereunto belonging or in anywise appertaining to the said above person and her heirs and assigns, forever."

In 1930 Ida Hagerott and Elwood Davis intermarried and ever since sometime in 1935 they resided on this land in dispute.

Shortly after the entry of the decree of distribution the mother,

claiming to be the owner of said land under the provisions of the will and the final decree, served notice upon the Davises to vacate said premises and to deliver them up to her. They refused so to do under the claim that the land had been given to Ida by her father.

The mother then commenced this action to quiet title to the land in herself and to determine adverse claims. The complaint is in the statutory form, requires the defendants to set forth all their claims to said property, and asks that the same be adjudged null and void and that title in the land be quieted in plaintiff.

Elwood Davis filed a separate answer wherein he "disclaims any right, title or interest in or to the premises described in plaintiff's Complaint."

Ida Davis filed and served an answer wherein she alleges that in 1926—

"This answering defendant alleges that in the year 1926 one Ernst Hagerott, the father of this defendant and husband of the plaintiff, was the owner in fee simple of the premises described in plaintiff's Complaint. That in the year 1926 the said Ernst Hagerott told this defendant that said land was hers and that she should regard and treat it as belonging to her, and then and there promised and agreed that it would be formally conveyed to her either during the lifetime of Ernst Hagerott by proper conveyance, or by will effective at his death. At the instance of said Ernst Hagerott, and in reliance upon the promise and agreement to convey said land, this defendant thereafter placed valuable improvements on said lands at her own expense.

"That this defendant was married in the year 1930 to Elwood Davis, and has ever since been and now is the wife of said Elwood Davis.

"That in or about the year 1935, the said Ernest Hagerott, the father of this defendant, urged this defendant to make use of the land which he had agreed and promised would be hers and to make her home upon it and place improvements thereon. That in consideration of the promise and contract to so convey said land, this defendant agreed to deliver to said Ernst Hagerott, during his lifetime, one-half of the crop raised upon said land, and said Ernst Hagerott further agreed to assist in financing the farming of said land during his lifetime, and requested that one-fourth of the crops from said land be delivered to the plaintiff herein, the mother of this defendant, during the remainder of

her natural life-time, if he, the said Ernst Hagerott, should die before the said plaintiff, to which this defendant agreed.

"That thereafter, in reliance upon said promise and contract, this defendant, with the assistance of her husband, did place further valuable improvements on said premises, to the total value of $1735.00, and paid substantial amounts for taxes levied on said lands. That this defendant, together with her husband, has made her home upon said lands since the year 1935.

"That this defendant has duly performed all of the conditions contained in said oral agreement and contract with Ernst Hagerott, her father, who died in the year 1938, and is the owner of said premises, subject only to the right of the plaintiff to receive one-fourth of the crops raised on said lands during her natural life-time.

"This defendant further alleges that the plaintiff, Dorette Hagerott, was aware and had knowledge of said contract and agreement as aforesaid, and has at no time objected to the dominion of this defendant over said lands or the placing of improvements thereon, or otherwise disputed this defendant's ownership, until the commencement of this action, and that the said plaintiff is estopped from denying the title of the defendant to said lands."

The defendant Ida Davis further filed and served a cross-complaint, wherein she alleges:

"That in the year 1926 one Ernst Hagerott, the father of this defendant and the husband of the plaintiff, was the owner in fee simple of the premises described as follows, to-wit: The East Half (E½) of Section Thirty One (31) in Township One Hundred Forty (140) North, of Range Eighty two (82) West, in Morton County, North Dakota. That in the year 1926 the said Ernst Hagerott told this defendant that said land was hers and that she should regard and treat it as belonging to her, and then and there promised and agreed that it would be formally conveyed to her either during the life-time of Ernst Hagerott by proper conveyance, or by will effective at his death. At the instance of said Ernst Hagerott, and in reliance upon the promise and agreement to convey said land, this defendant thereafter placed valuable improvements on said lands at her own expense.

"That in or about the year 1935, the said Ernst Hagerott, the

father of this defendant, urged this defendant to make use of the land which he had agreed and promised would be hers and to make her home upon it and place improvements thereon. That in consideration of the promise and contract to so convey said land, this defendant agreed to deliver to said Ernst Hagerott, during his life-time, one-half of the crop raised upon said land, and said Ernst Hagerott further agreed to assist in financing the farming of said land during·his life-time, and requested that one-fourth of the crops from said land be delivered to the plaintiff herein, the mother of this defendant, during the remainder of her natural life-time if he, the said Ernst Hagerott, should die before the said plaintiff, to which this defendant agreed.

"That thereafter, in reliance upon said promise and contract, this defendant, with the assistance of her husband, did place further valuable improvements on said premises, to the total value of $1735.00, and paid substantial amounts for taxes levied on said lands. That this defendant, together with her husband, has made her home upon said lands since the year 1935, and remains in possession thereof.

"That this defendant has duly performed all of the conditions contained in said oral agreement and contract with Ernst Hagerott, her father, to be by her performed. That said Ernst Hagerott died in the year 1938 without delivering to this defendant an executed deed of conveyance to said property, and without specifically devising it to her in a will, to the best of her knowledge.

"That the plaintiff, Dorette Hagerott, the surviving widow of said Ernst Hagerott, claims an estate or title to said lands by reason of a Final Decree of Distribution issued by the County Court of Morton County, North Dakota, in the course of the probate of a will made by Ernst Hagerott in 1923, in which will all his property is devised and bequeathed to said Dorette Hagerott, but in which no property, either real or personal is specifically described.

"That the plaintiff, Dorette Hagerott, was aware and had knowledge of the contract and agreement as hereinbefore set forth, prior to the decease of said Ernst Hagerott, and that she at no time objected to the dominion of this defendant over said lands, or the placing of improvements thereon, and she is estopped from denying the title of this defendant to said lands, or from asserting an adverse title.

"That by virtue of the contract and agreement, and the performance of it by this defendant, the equitable title to said lands passed to this defendant long prior to the death of said Ernst Hagerott, and by virtue of the knowledge of the plaintiff, Dorette Hagerott, as hereinbefore alleged in paragraph 7, the plaintiff received any bare legal title under said Final Decree of Distribution, subject to the equitable claims of this defendant.

"That by reason of the knowledge of the plaintiff of said contract and agreement between this defendant and Ernst Hagerott, and the actions of said plaintiff in thereafter permitting the undisputed possession of this defendant of said lands, and the consent to the continued placing of valuable improvements thereon, the said plaintiff ratified and became bound by the terms of said contract and agreement."

To this answer and to the cross-complaint the plaintiff entered a general denial except as to her failure to tender the sum mentioned and as an affirmative defense alleges:

"1. That the defendants entered into possession of the East Half (E$\frac{1}{2}$) of Section 31, Township 140, Range 82, during the year 1935 pursuant to a lease, by the terms of which the defendants, as tenants, agreed to farm said premises for one-half share of the crop and to pay the taxes on the NE$\frac{1}{4}$, while the landlord was to receive one-half share of the crop and pay the taxes on the SE$\frac{1}{4}$; that they remained in possession of said premises under said lease during the years 1935 to 1938, inclusive, and performed the terms and conditions thereof, except that they failed to pay the taxes on the NE$\frac{1}{4}$ of said section for the years 1937 and 1938.

"2. That Ernst Hagerott died on the 19th day of August, 1938; that the plaintiff is his surviving widow and heir at law, and that she acquired the fee simple title to the premises described in the complaint through the last will and testament of the deceased, and the final decree of distribution of the County Court of Morton County in the estate of said deceased.

"That the defendants and each of them knew that the premises described in the complaint were devised to the plaintiff in the last will and testament of said deceased and that with knowledge of said fact and in recognition of the plaintiff's title to and ownership of said

premises, entered into a new lease after the death of said decedent by the terms of which they agreed to farm said premises for three-fourths share of the crop and as a consideration therefor the defendants agreed:

"1. To deliver one-fourth share of the crop to the plaintiff; and

"2. To pay all of the taxes levied and assessed against the one-half section during the terms of said lease.

"That the defendants remained in possession of said premises pursuant to the terms of said, new lease during the farm seasons of 1939 to 1943, inclusive, and during said time delivered one-fourth share of the crop each year to the plaintiff and paid a part of the taxes levied and assessed against the one-half section pursuant to the terms of their contract.

"That the defendants did not make any permanent or valuable improvements upon said premises during the lifetime of Ernst Hagerott and that the improvements which the defendants made after his death are not of a permanent character, and that the plaintiff claims no title to or interest in improvements made after the death of said deceased, but has at all times consented to the removal thereof from said premises by the defendants."

Comparable to the case of Heuer v. Heuer, 64 ND 497, 502, 253 NW 856, 858, "the question here is as to whether a valid title may be predicated upon the facts and circumstances established in the record."

At the outset it may be stated there is nothing in the record whatever to show the father ever told the defendant Ida Davis "that she should regard and treat it (the land in question) as belonging to her and then and there promised and agreed that it would be formally given to her during the lifetime of Hagerott by proper conveyance or by will effective at his death," as claimed by her. No testimony was introduced by the defendant personally as to any talk or agreement with her father, and no one testifies to any statement by the father that he would leave the land to the defendant by will. Defendant's attempt to spell out her right to the land is based upon testimony of other witnesses as to statements made by the father.

The records show that the land in question was contiguous to the parental home. The defendant was a schoolteacher and at times lived at home. In 1926 there were no buildings upon the land involved, but in that year the defendant hired one Danielson to dig a well

thereon and paid him thirty-five dollars for the work. George Hagerott, her brother, states that the defendant then owned cattle, the implication being that these cattle were pastured on this land and she had the well dug for convenience. This the defendant denies.

In 1927 the father had one Fristad erect a windwill on the premises involved. Fristad had been acquainted with the Hagerott family all his lifetime. He testified as follows:

"Well, after we had set up the windmill we went in and had lunch, and it was just around four o'clock, and Mr. Hagerott told me before I did set up the windmill that land was deeded to Ida. He told me before at different times, also since, and he asked Mrs. Hagerott, his wife, to go and get the deeds. She brought out three deeds, one was to Anna, one was to Alma and one was to Ida, and he said they are living there. He said 'This place that we are living on here goes to Anna;' and That 'over where we put the windmill on that is the deed to Ida for that land. And over the hill, over where the pasture is, over on the other side of the pasture, that is Alma's,' he said."

But on cross-examination, he answered:

"Q. You said that the father told you in 1927 that the land upon which the windmill was then being fixed, was to be Ida's?

"A. Yes."

He testified that the mother was present at the time of this conversation. This is the only explicit statement in regard to the existence of a deed at that time. The testimony of Fristad does not show a delivery of this deed to the defendant or to anyone for the defendant. Later we set forth an alleged statement by the father that he was afraid to deliver the deed to Ida because she might mortgage it and her children thus lose the property.

Evidently the deed was still in the possession of the grantor, though he sent the plaintiff to get it. Presumably she knew where this and the other deeds were kept. There is nothing to show that the deed had been delivered to the mother in escrow. The record fails to show the contents of the deed or what became of it. Whether the father determined not to deliver it, but destroyed it when he made the statement hereinafter mentioned that Davis would break his neck in the matter of trouble regarding cattle, and thereafter filed his will with the county court is not known.

Fristad testified further that five years or so thereafter, in a conversation with the father, regarding the house that is now on the land, the father said the house would be big enough for Ida to start in and that he (the decedent) had started in just as small a house and "got along good." He testified further that the father never said anything as to the conditions "under which it was to become Ida's." "He did not mention no details at all."

Elwood Davis testified that he came from Canada in 1929; became acquainted with his wife in that same year, and they were married in October 1930. He said at first that immediately after their marriage they lived in Center until the spring of 1935, but it is apparent that upon their marriage they went to Yellow Grass, Saskatchewan, where they remained for a month or two and then returned to this country. His difficulty in return will be referred to later. They were planting trees and making improvements on land near Center when the father told Ida there was no use of her doing that, but to come down and put improvements on her own place; and so in 1935 he and his wife came to live on this land. There was a house on the land that had been completed shortly before they moved there. He testified that the father and he went to the Anderson Lumber Company in Bismarck in the fall of 1934, got the lumber for the house on this east half of section 31 and the father told him he would have to "work the lumber off"; that he did work out the value amounting to between four and five hundred dollars. The work consisted of taking care of cattle, using his own horses with the father's tractor in plowing land for the father, and that he received no money for the work. He testified that the father helped to put up the chicken coop and thereafter he himself put on a barn and tree granaries at a total cost of $525, but these were placed on the land after the death of the father. These improvements were not attached to the land—just resting thereon. Later he testified that the lumber for the house was bought in Mandan from the "Bingenheimer Lumber Company," that the father bought the lumber, and he and the father hauled it out. When they moved on to the land there was a fence on three sides of a pasture, a well, and the windmill. In 1931 or 1932 the father told them where they should build the house when they built one.

When Davis was asked whether the father had ever made "any state-ment relating to the disposal of this particular piece of land" he said, "Not anything outside of it was supposed to be hers" and with reference to that, he said, "The only time (was) when we were planting those trees, that she should come down and make improvements on her own. That's the only (time) I could put my finger on it."

When questioned in regard to an alleged conversation with one Wentz, a son-in-law of the father, wherein it was claimed witness stated he did not intend to make improvements on land that did not belong to them, he said he could not remember making any such statement, but would not deny that he may have made it. He admitted that during the lifetime of the father the father furnished the seed, paid the taxes, one-half of the twine and threshing bills, and got one-half of the crop, and that after the death of the father he furnished the seed himself, agreed to pay the taxes, and give the mother one-fourth of the crop. Apparently some of the children were doing the same. His explanation of why there was this arrangement for the mother was that the father had said the mother would have to have something to live on as long as she lived. He further stated that after the probate of the property and after the mother had served notice on them to vacate the premises, he purchased a farm in Morton County in July, 1943.

At the time of the settlement of the hearing on the final account of the estate he offered to buy the half section after he learned the mother claimed the title—that is, when she served the first notice on them to get off, March 25, 1943. He stated that "Ida's mother had been getting one-fourth of the crop and that is the way her dad wanted it as long as she lived, and in order to get away from all of this matter we are going through, we figured that if we could give her a cash deal of some kind and not have it mixed up with the Court all of that time." He said that thereafter he bought a piece of land, but this was not done with the intent of moving off the land after his mother-in-law served them with notice to vacate.

The brother George testified specifically as to trouble between Davis and the father and mother. The mother was angry about it, he said, because Davis was taking some pail calves the mother had raised "and she would not stand for that," and wanted to get the sheriff. The father tried to get the sheriff, then told her to leave them alone, that

Elwood would "break his own neck." George stated that in October 1937 he and his sister Rose were at the home place and the father said the Davises had "no claim there; that when he was gone it was to be mother's and she would be the boss." He testified after the death of the father he got his deed which was dated June 22, 1937, and that he knew about the deed before the father died. Davis admits there was trouble or dispute when he was taking away twelve to fourteen head and the mother told him to leave them on the place or she would have him arrested and this was in July of 1936. He explained how he took care of some of the father's cattle and that as to four cows "he figured he (the father) sold her (his wife) those four head of cattle."

In September of 1936 the father filed in the county court this will which he had executed in 1923 and in 1937 he made out deeds to quarter sections of land, one in particular to his son George.

Henry Wentz, a brother-in-law of the defendant, testified to being present at the time of the trouble over the cattle and the father said to "leave him alone and he will break his own neck. He will gain nothing out of it." He also testified that when the Davises moved onto the land in 1934 they told him they would like to fix the place up but they "did not care to as long as they did not own it." He said the Davises had put a barn on the place but "they did not care to put it on a foundation because they did not know when they would have to tear it down again," and further said the Davises told him they were not going to put any improvements on the land or fix it up because they were not the owners of the land and they told him they were renting it on the one-fourth bushel and had to pay the taxes. He admitted he advised the Davises not to move off but this was "for the simple reason that they were renting it. The rest of the kids were renting and living on the father's place too."

With reference to the taxes, the parties stipulated that as to this northeast quarter the taxes from 1934 to 1942 inclusive were paid either by the father or the plaintiff except for the years 1935 and 1942, these being paid by the defendant and that the defendant made the first payment of the taxes for 1936. The stipulation further shows that as to the southeast quarter the only taxes paid by the defendant was the tax for the year 1942. All other taxes from 1934 to '42 were paid

by Ernst Hagerott or by his wife after his death. The defendant had testified that she paid one-half of the 1942 taxes on the east half and the 1936 taxes on the northeast quarter and the 1935 taxes on the northeast quarter. She claimed that she paid other taxes, but this is negatived by the stipulation as to the taxes entered into.

Defendant testified: that immediately after their marriage she and her husband went to Yellow Grass in Saskatchewan, remaining there until January 1931. Their purpose was to return to the United States; but it seems that they were afraid of difficulty in making re-entry. Consequently, on December 21, 1930, the defendant wrote to her brother George, saying among other things:

"El is going to apply for his paper a week from tomorrow and I guess it will be hard to get him unless I can prove that I have property in the States. So, Geo., I am going to ask a favor of you. Listen, you ask the folks if I can claim that half section for a while since they haven't reg. the deed anyway and then my lot (?) deeds are at Iverson's office. You can get Iverson to write out a copy or rather a paper to state it belongs to me and etc. Guess you's will (*blurred*) ·best. Maybe the real ones will be best. Ans. right away and get this done right away as we would like to get back sometime in January. C? Don't forget and I'll return the favor some day when you need it."

This was in 1930. To what deed did she refer? Was it the deed to which the witness Fristad referred? When questioned as to whether she was referring to the half section involved, she admitted she wrote the letter, but said it did not refer to section 31. She did not state to what land it did refer. There is no intimation in the record of any other deed which would affect her. Clearly, whatever deed it was, it had not been delivered to her and the fair import of the letter is that she was merely wanting to make use of some deed in order to fabricate evidence and to facilitate the return of herself and her husband.

She testified she claimed the land as hers in 1929 and '30 and '31, between those dates. But later she said, "I did not consider it as my own until after the death of my father." Again later on, she stated she had made improvements on the land and had considered it as her own before the death of her father and even before 1926.

She did not testify as to any agreement or talk or promise made by

her father to her personally, but it is evident that as neither she nor the mother testified as to any transaction had with the decedent both of them were prevented from testifying because of the provisions of § 7871 subd. 2 of the Revised Code, as amended by chap. 189, Sess. Laws 1929, prohibiting such witnesses from testifying one against the other as to any transaction had with the testator, unless called to testify by the opposite party.

On January 31, 1942, the defendant, referring to the land in dispute, wrote to her mother saying among other things:

"About renting we are renting the same as other years, we are also planning to rent the pasture.

"About taxes we have paided taxes and would of paided last fall too if you would not of done so before we had our wheat Loan thru."

At first Ida stated that she did not ask to rent the land from her mother after her father died, but afterwards when shown Exhibit 9, the letter quoted above, she said she wrote that and sent it over to her mother and that it had reference to this half section. This was about the time proceedings for probate of the estate were begun. She also testified that after her husband bought the land known as the Brilz place they moved there the seed to be used in 1944, but said that was because they had no granary to put it in.

In the process of the settlement of the estate, the inventory set forth this land as part of the estate, the will gave all of the estate to the mother, and the defendant was a party to these proceedings for settlement.

On one hand, it is claimed, however, that though the father had deeded land to some children and made gifts of lands to others of the children, all was with the express declaration that as long as the mother lived the grantees, etc., were required to give the mother one-fourth of the crop and pay the taxes and this offer in the letter (Exhibit 9) was in harmony with that understanding. On the other hand, it is claimed this letter is an admission by defendant that she had no title to the land or interest therein.

Anna Bahm and Rose Cordes, sisters of the defendant, testified in substance that on numerous occasions, and particularly the summer before the father died, he made statements regarding Ida and this

land, stating "there is a piece for each of you." Anna says her father told her, "I would give Ida her deed but I am afraid that if she puts a mortgage on it when the children grow up they will have nothing." She testified that in the summer before their father died she was staying with him at nights. He was suffering from cancer and she was there frequently to take care of him. Her testimony is that during conversations with her he said to her, "You children see that Ida gets her piece of land . . . There is a piece for each of you." She testified he said this to her five or six times and that "he always referred to that as 'Ida's piece of land,' " referring to this east half. She testified further that he said, " You children should see to it when he died that Ida would get this half section."

The father gave Anna a deed to a half section and gave her brother George a half section, and she understood that her brother Henry got a half section. She testified further that the father said, "I would give Ida her deed, but I am afraid if she puts a mortgage on it when the children grow up they will have nothing." Anna said there was no reservation in the deed she got as to a share of the crop to go to the mother, but the father said that she had to give a share of the crop the same as the others.

Rose testified that "before Ida was married, Father told me, or referred to the land, that it should be Ida's sometime in the future." He told her that Ida could not make any money up where they were living and that as long as she was not to live there she might as well "move home on her half section," and this was before she came down. She testified further that during his last illness, he told her at different times "that Ida was to have 'hers' across the road, that where she is living now." She said that during this last illness her father "told me what we were all to get. He started in with Walter. He said he had $23,000 which he never paid him back. He said that is what he did for Walter and he was to get no more. Henry was to get the half section in Section one. Emma was to get the Bartram home up where she lived. He told me he deeded it to her and that Alice also got her deed. One Thousand Dollars for myself. George was to have the Butte Half. Ida was to get hers across the road where she lived. Then he went on to tell that Anna was to have the home place and

Alma the Judson place. He made those statements all in the presence of mother while she was sitting across the bed from me. Now that was not more than a week before he died." She said her father told her "there was a little square barn on the place and he told me that Ida was to move that over onto her place so she would have a barn she could put her stock in."

The record shows that prior to his death the father had made deeds giving a half section of land to his daughter Alice, a half section to his daughter Anna, a half section to his son Henry, a half section to his son George, and that Rose was supposed to have a half section. This witness Rose had received from her father money but apparently did not get a deed to any land.

The sister Alice testified that in 1936 Ida and her husband were at the father's place and Mr. Davis had trouble with the father, that "Mr. Davis evidently wanted to take everything." She further testified that in the spring of 1936 she went out to stay at her father's place. At one time Ida and her husband were there and her father said that "he was all alone, that the Davis' did not have anything more to say there, that they were through there." Henry Wentz was there also at that time, and her mother. She afterwards stated that the Davises came over and wanted to rent of her father and the substance of the conversation was that they were to pay the taxes on the northeast quarter and rent for half and that was the lease that was to be made in the spring of 1936. She said that her father had not been feeling very well "and he told me that he thought he ought to start settling things up."

She testified that, shortly after the father died, at a Triple A meeting the Davises tried to have a man by the name of Walter Smith speak to the mother "so they would have the right to rent for one-fourth of the crop and pay all the taxes," and thereafter an agreement was made on those terms and it was signed by Ida and her husband. She further testified that when the father made out the deeds to the four of them the mother delivered hers after the father died, but her father had given it to her and given her the possession to the land and she left the deed in the strong-box and that this was in June, 1937, and a year before he told them that "the Davis' were all through."

From her testimony, it is apparent that a man by the name of Iver-

son made out the deeds, presumably the man Ida referred to in her letter from Saskatchewan. No explanation was given as to why Mr. Iverson was not called to testify about having made out a deed to Ida.

The brother Henry testified that the father gave him a deed to a quarter section of land. The deed was dated 1937. It was land that he had farmed for several years prior thereto and he had farmed it under a verbal lease whereby they were going "50/50, and the last years now one-fourth of the crop and I pay the taxes." Mr. Holter testified that since his wife got the half section of land they have been delivering to the mother one-fourth of the crop every year.

It is significant that the will was executed in 1923. Where the instrument remained for the next few years is not shown, but there was some trouble between the father and the mother on the one hand and the Davises on the other with reference to the cattle in September 1937 after the father said the Davises had no more interest in the land. The will was taken then to the county court and filed with the county judge and this was the will which was probated.

We are justified in assuming as true the statements made by Alma and Rose as to the conversations with the father when he was in his last illness. Does that mean the father, realizing he was near his end, mitigated his anger against Ida and her husband and created a trust in the land for Ida; or does it mean that he wanted these daughters to use their influence with the mother to see that when she disposed of her property she would deal fairly with Ida?

The trial court found for the defendant and from the judgment entered the plaintiff appeals demanding a "re-trial of the entire case upon its merits." There are numerous specifications of errors, but with the exception of objections to the introduction of certain evidence, the appeal centers around the validity of the findings made by the trial court, it being the claim of the plaintiff that the facts show clearly the defendant has no title to or interest in the land. Consequently, we determine the issue solely upon the evidence that was introduced without reference to the objections that may have been raised as to some of it.

The trial court prepared and filed a short and concise memorandum opinion. Therein it is stated: "This is one of those border-line cases. It is my opinion, however, when the testimony is read in the light of

the decisions in the cases of Heuer v. Heuer and Brock v. Noecker that the defendant should prevail." In the memorandum opinion; the court states:

"The fact that Mr. Hagerott made a will in 1923 giving all his property to his wife would carry considerable weight if he had not since given his other children most of his property. The Testimony shows he did execute a deed of this land to Ida Davis but that, of course, did not convey the land in the absence of a delivery. It does, however, support the testimony of Mr. Davis that the land had been given to them."

Both parties cite with more or less assurance the holdings of this court in Heuer v. Heuer, 64 ND 497, 253 NW 856, supra, and Brock v. Noecker, 66 ND 687, 267 NW 656.

So far as the respondent is concerned, the case of Heuer v. Heuer, relied upon by her in support of her claim, differs so radically from the case at bar that the principles laid down there are not applicable to this case. In this Heuer Case, it was shown that the son and his wife lived with the father for a year and then the father in 1913 told him "this is your land," to farm it any way he wanted, but that he was holding the deed for him so that he would not lose the farm. The gift was completed. Thereafter the son moved onto the farm, lived there for twenty years, farmed it as he saw fit, paid the taxes and some interest on the mortgage, made no accounting to his father or anyone for rents or profits, made permanent improvements on the land, and by common reputation was the owner.

In the case at bar, the defendant, while claiming the land from 1926 or even prior thereto, did not move onto the land until 1935, made practically no improvements upon the land, did not pay the taxes on it, gave the father one-half of the crop every year while the father lived, the father paying one-half of the twine and thresh bill, and nowhere is there any explicit statement that the father said to the defendant, "This is your land," nor anything equivalent thereto. That there was in the mind of the father a feeling or understanding that later on Ida might get this land is quite clear. Evidently, in this family of nine children, knowing the father owned a great deal of real estate, all members of the family talked—in a general way, at least—of what disposition the father would make of the land and evidently

the father joined in the discussions. They talked about what the father was going to do with the land and what he said about it, but always in the future and with no revocation of the will. There was a common "understanding" but nothing to indicate but what the father was the one to make the determination, and after his death, the mother. It is true the record shows that in 1926 Ida spent thirty-five dollars to have a well sunk and there is testimony to show that her husband in 1935 worked out the value of the lumber that went into the little house. Other than this, there was practically no improvements made by Ida or her husband. In the Heuer v. Heuer Case, the record shows emphatically that the father, so far as the son was concerned, took no more interest in the land involved in that case. He had said to the son, "This is yours and I have the deed to this which I am holding." Though subsequently he mortgaged the land to his brother, this brother had notice of his nephew's right through occupancy, and the contest was between uncle and nephew.

In the case at bar the record shows the father still had an interest in the land. He paid for the windmill, got the landlord's share of the crops, either advised or counseled or directed the place where the buildings were to be put on if any were built, and the record is clear that whatever the father's intent was it was something to be determined finally in the future and no date set therefor. In the case at bar, there is no proof of any common reputation of ownership by the defendant other than the statements of some of the sisters to the effect that the father said this was to be Ida's land. It is not a case of a father making a completed gift and retaining the record title to aid the grantee, though there is reference to the fact that if Ida got a deed her children would lose the land. Even taking the view most favorable to the defendant we must find that the father did not give her the land, though at times probably having an intention to do so in the future. The burden is upon the defendant to show with reasonable certainty a parol gift completed. On this feature the whole matter is in a sea of uncertainty and there is no chart to guide. Defendant has not sustained this claim.

The case of Brock v. Noecker, supra, also differs so radically from the case at bar that it does not sustain the defendant's contentions. In this case cited, an agreement had been made between the mother and the son that if he would farm the mother's land, assume the control and

management and responsibilities thereof, all in a good and husband-like manner, and deliver to the mother a certain share of the crop each year, make a home available for her, and keep this up as long as she should live, then she would convey the premises to the son, either by deed or will. There is nothing in the case at bar comparable to this. Whatever agreement there was, was not between the mother, who was the heir under the will, and the daughter. It is the claim the similarity exists in that there was an understanding or an agreement between the father and the daughter to this effect, so far as the giving of the share of the crop was concerned. In this Brock Case, the son brought suit against the executrix to require her to convey the land to him because of this contract. This was while the estate was in process of probate. The claimant to the land denied that the land belonged to the estate of the mother. He claimed it as his own. In the case at bar no claim was asserted against the executrix during the progress of the settlement of the estate. But eliminating that feature, there is no proof of any contract between the daughter and the father. True, there are more or less certain or vague statements (depending upon the weight given to the testimony) that the father had disposed of his land but wanted the children to give to their mother one-quarter of the share of the crop each year while she lived; but in none of the deeds given was there any such statement shown to have been incorporated therein. The inventory filed in the settlement of the estate shows two quarters of land in addition to the half section involved herein, with town lots in Mandan and Bismarck appraised at $7200.00, and no part thereof was listed as a homestead. Clearly, the father had not disposed of all his real property.

It is true that a situation which might suggest that of landlord and tenant may turn out to be of a different type and therefore the delivery of a share of the crop may not establish the relationship of landlord and tenant. Nevertheless, all of the crop relations shown in this case are also those of landlord and tenant.

It is not the claim of the family that the share of the crop given to the father during his lifetime was any other than a landlord's share, though the defendant in this case does claim the land had been given to her by her father some twelve years before he died. It is significant that all of the actions of the defendant and her husband, while the

father was living, are indicative of those of a tenant, except the assertion that the son-in-law worked out the value of the lumber. No permanent improvements were made other than that, no taxes were paid, the buildings and granary that were placed temporarily upon the land after the father's death were not on any foundations. The father got the landlord's share, paid the taxes on the land and it remained in his name. The situation with reference to the share of the crop the mother was to receive is as compatible with landlord and tenant as with any other relationship. The terms were identical with that of the father, save in the amount to be received and payment of taxes. In this Brock Case, the son was to furnish and did furnish a home for his mother in which she could remain. She had the option of staying there or somewhere else if she saw fit, and the record shows that she did—at one time, at least—make a will leaving him the land. If such will had been made, it had been revoked; but that did not affect the rights of the son.

In the case at bar, however, a will had been made, general in its terms, leaving to the mother all of the property of which the father died seized and possessed. This was three years before the defendant claimed she had any interest in the land and twelve years before she moved onto the land, and the will never was revoked. While there is proof that at one time the father had executed a deed, there is no proof that he ever delivered it and it is clear he did not intend to deliver it, if the testimony of the witness is correct that he said he would not give Ida the deed because she would lose the land or mortgage it.

There is ample evidence to sustain a situation somewhat as follows: the father, being the possessor of a large number of parcels of land and having nine children, intended to leave all of his property to the mother, feeling certain she would deal fairly with the children upon her death, but there was no limitation on what she could do; that at the time of the execution of the will and even thereafter he had told different ones in the family of tentative plans to parcel out his land, some of which he carried out; that some trouble arose between the father and mother on the one hand and Ida and her husband on the other which angered the father and he abandoned the idea of leaving Ida some land, and shortly thereafter he filed his will. If he had made a deed to Ida for this land, probably he destroyed it. Then when he

came near to the day of his death his thoughts turned to his sons and daughters; he executed some deeds such as to George and to Anna; his irritation toward Ida, and her husband diminished so that he wanted some of the children, at least, to see that eventually Ida would get from the mother some of the land. Evidently, he wanted these children to discuss the matter with their mother. But this is far from establishing either gift or trust. It did not in any way put any limitations upon the heirship of the mother under the will. The statement in the will that he left the property to his wife feeling that she would do the right thing by the children is an expression of his opinion regarding her maternal care, was never repudiated, and is not in any way a limitation upon her right of succession.

Assuming Mr. Fristad saw a deed, as he testified, there is nothing to indicate he saw anything but a paper of some character. He does not say he saw Ida's name as the grantee nor does he say he saw the description of the land. He does say the father called it a deed and said it referred to the land involved here. Assuming that there was such a deed, it is clear it never was delivered to Ida. This deed given to George was not given to him until ten years thereafter. The defendant has failed to show any gift.

Has the defendant shown that there was an equitable trust created of which she is the beneficiary and that in equity and good conscience requires the court to hold she is the owner of the land? When cases are "on the border line" it is difficult at times to determine just what are the facts; but when the facts are determined the rule to be applied is settled.

While "an owner may by his own voluntary declaration create a trust of his property for the benefit of a third person without a change of possession and without any consideration," yet "a trust will not be inferred from the mere failure of a given transaction to operate as a completed gift but must rest upon substantial proof tending affirmatively to establish an intention to create a trust." McGillivray v. First Nat. Bank, 56 ND 152, 217 NW 120.

We say in Reel v. Hansboro State Bank, 52 ND 182, 201 NW 861:

"Whether a trust has been created is primarily a question of intention. What the law requires in order to effect a divestiture of the

beneficial interest must be done by the donor. . . . If the gift be imperfect and something remains to be done by the donor to perfect an intention to make a gift or create a trust, a court of equity leaves the parties where it finds them. It will not aid in completing an incomplete transaction, or in enforcing that which rests only in an unexecuted intention. When, however, there is an actual settlement made for vesting the estate in a trustee and an intention so to do clearly and unequivocally appears, a court of equity will enforce it."

Such rule is applicable in this case and the burden is upon the defendant to show this clearly; since "to establish a resulting trust in real property by parol testimony the evidence must be clear, convincing and satisfactory, and of such a character as to leave . . . no hesitation or substantial doubt." Carter v. Carter, 14 ND 66, 103 NW 425.

The mere fact that a person may have executed a deed with the thought that thereafter he might deliver it and thus make a gift of the property is of little, if any, evidentiary value in determining that he changed his mind and intended to create a trust. His intentional failure to deliver the deed so that title did not pass does not add materially to the force of subsequent statements so as to become evidence of a resulting trust.

Whether or not a person who has indicated at times that he intended to make a gift of land to another but fails so to do becomes thereafter a trustee for that person is primarily a question of intention. McGillivray v. First Nat. Bank, supra. The failure of the father to make a completed gift does not in itself show that he became a trustee and the subsequent statements made by him, and particularly those made near the time of his death, indicate strongly that while he may have come back to his original intention of making gift, yet he never completed the gift and fell back upon the mental assurance he had that in the final disposition of her property the mother would do the right thing according to her own best judgment and he was willing to abide by this. Thus he finally determined the property should go to the mother without any reservation, having confidence that she would handle her property wisely.

When we consider all of the testimony we are satisfied the defend-

ant has failed to sustain the burden of proof in this matter and to show any title to the land in herself, or any right to the title.

Much is said about improvements which the defendant placed on the land. These are removable and they belong to the defendant. She is entitled to a reasonable time in which to remove them. In view of the season and weather conditions, six months is a reasonable time. The judgment is reversed and it is ordered that judgment be entered in conformity with this opinion.

MORRIS, Ch. J., and CHRISTIANSON, BURKE, and NUESSLE, JJ., concur.