Rockingham, }
Dec. 6, 1932. }

MAE R. KNOX, *Ex'x v.* MARY CHAPMAN PERKINS, *Ap't.*

*Arthur O. Fuller, Perley Gardner* and *Sewall & Waldron* (*Mr. Sewall* orally), for the appellee.

*Cooper & Hall* (*Mr. Cooper* orally), for the appellant.

MARBLE, J.  The appellant and Charles P. Chapman were foster children of Electa Chapman.   In 1918 Electa made a will leaving all her property to Charles in the event that her husband should not survive her.   Her husband died in 1922.   Two years later she executed a codicil leaving her property to the appellant in case Charles should not be living at her death.   At the same time Charles made a will, the material clause of which was as follows: "I give, bequeath and devise all my property, both real and personal, to my mother, Electa A. Chapman, but if she be not living at my death, I give, bequeath and devise all my property, real and personal, to Mary Chapman Perkins of Sacramento, California."   This was the lost will, so called.

While in the office of the attorney who drew the will and codicil, Electa explained in Charles' presence "that she was very anxious that Charles should have the property while he lived, and that upon his death it should go to Mary."   The attorney "suggested a life estate with a remainder over," but "Electa expressed herself as not wanting such an arrangement, and stated that she wanted Charles to have the use of it, and the spending of it, and that he would do what she wanted in the will."   The court has found that in so far as silence can be deemed to be assent, Charles acquiesced.

Shortly before her death, which occurred May 15, 1924, Electa "proceeded to transfer nearly all of her money and securities to Charles."   On June 16, 1928, Charles engaged the appellee as his housekeeper, and ten days later executed a will leaving his property to her.   He died at his home in Newmarket on July 21, at the age of fifty-nine.

During the progress of the trial, the claim that Charles was not of testamentary capacity at the time he executed the will of June 26 was abandoned, and the appeal from the allowance of this will was tried upon the issues of the alleged undue influence and fraud of the appellee.

To justify the disallowance of a will on the ground of undue influence, it must appear that the influence charged is the equivalent of force and coercion—an influence which overpowers volition and substitutes another's will for that of the testator. *Bartlett* v. *McKay*, 80 N. H. 574; *Albee* v. *Osgood*, 79 N. H. 89, 91, 92, and cases cited.

In 1928 Charles was living alone. He was not in good health, and his physician had advised him to employ a housekeeper. The appellee, who had once lived in Newmarket but who was then living in Maine, applied by letter for the position. In the course of the correspondence Charles wrote her as follows: "What I should do is get me a wife, but no one wants to marry an old man with as small amount of money as I have."

The appellee was married, but had separated from her husband. She had been married several times before. Charles proposed marriage to her soon after she assumed her duties as housekeeper and "got in touch with an attorney about getting a divorce for her." In the meantime he went alone to a lawyer's office and executed the will of June 26.

On the issue of undue influence the trial court has made the following findings: "The influence was not shown to be anything more than that which resulted from care, kindness and possibly affection. Charles had always been more or less dependent upon his mother. After her death he missed the presence of a woman in his household. He wanted a housekeeper, and wrote Mrs. Knox to come. She suited him, her care and attention pleased him, and he did not want to lose her. There was no evidence that she ever asked him to make a will in her favor, or that she in any way sought or attempted to dictate what he should do with respect to his property. He could have discharged her at any time, and the will was always within his control, so that he could have destroyed it if he had become dissatisfied. Such influence as may have been exerted by her presence, by her efforts to please, or by her care and kindness, was not 'undue'."

The evidence has not been transferred, but on the reported facts it is extremely doubtful if any other conclusion could properly have been reached.

Fraud in procuring the execution of a will is recognized in this jurisdiction as a distinct issue. *Cobb* v. *Follansbee*, 79 N. H. 205, 209. The appellant excepted to the refusal of the court to rule that "there

was a duty upon Mae Knox to tell him [Charles] of her past, and by her failure to speak, she obtained that promise of property and offer of marriage by deceit, conduct amounting to fraud."

The appellee had been three times married and divorced. About ten days after her arrival, Charles said to her: "I would like to have you stay here and be my wife, and if you would be my wife of course you would have all I have got any way. I like you and I would like to have you stay with me." She gave him to understand that she consented. She did not "inform him as to the details of her past," but he knew that "she was still the wife of Mr. Knox."

The fraud necessary to invalidate a will does not differ from that required to vitiate an ordinary contract. *Newhall's Estate*, 190 Cal. 709, 719; 1 Page, Wills (2d *ed.*), s. 184. "Fraud may consist in the intentional concealment of a material fact as well as in a false statement of a fact." *Benoit* v. *Perkins*, 79 N. H. 11, 15, and cases cited. Obviously in will cases, the deception must be such as to induce the testator to make some disposition of his property that he would not otherwise have made. 40 Cyc. 1142, and cases cited. Fraud may of course be inferred from circumstances. *State* v. *Hale*, 85 N. H. 403, 406; *Cavanaugh &c. Inc.* v. *Barnard*, 83 N. H. 370, 372. "But it will not be implied from doubtful circumstances which only awaken suspicion." *Jones* v. *Emery*, 40 N. H. 348, 350.

The special findings indicate that the trial court believed from the evidence that Charles either knew of the appellee's former marriages, or if he did not know, would have made the same disposal of his property after learning the facts. In such a situation the appellant's request was properly denied. *Rishton* v. *Cobb*, 5 Myl. & Cr. 145, 151; *Janes* v. *Ranken*, 87 Hun 57, 59.

There remains for consideration the contention that Charles' estate is impressed with a trust. The amount of the property which Charles received under Electa's will does not appear. But this is not important, since the appellant does not limit her claim to the specific property so received, but seeks rather to acquire the total assets of the estate on the theory that there was a valid and enforceable contract between Charles and Electa to refrain from altering their wills.

If such a contract existed, the appellant is doubtless correct in her contention. It is understood that no real property is involved. See 1 Alexander, Wills, s. 101. But even if this were so, full performance by Electa of her part of the agreement would take the case out of the operation of the statute of frauds. *Southern* v. *Kittredge*, 85 N. H. 307, 309, and cases cited; *Carmichael* v. *Carmichael*, 72 Mich. 76, 85;

40 Cyc. 2117. The statute of wills would not be violated, for such a contract is not a testamentary disposition of property. *White* v. *Winchester*, 124 Md. 518, and cases cited.

There is no suggestion that Charles left his property to the appellee as payment for her services. She "was paid her wages regularly each week right up to the time of his death," and "expected no further pay or reward." If the consideration for the execution of the will of June 26 was a promise on the appellee's part to marry Charles after she had obtained a divorce, this promise was "totally void." *Noice* v. *Brown*, 38 N. J. Law 228, 229; 9 C. J. 324, and cases cited. Consequently the appellee is, or, at least, could be found to be, a volunteer.

"It is undoubtedly true that one may make a contract binding upon himself to make a particular testamentary disposition of his property, and he may validly renounce the power to revoke his will." *Rolls* v. *Allen*, 204 Cal. 604, 607; *Note*, Ann. Cas. 1916 D, *p.* 1160. If, however, he breaks his contract and dies leaving another will, "Equity does not compel the probate of the revoked will, and the court of probate, uncompelled, neither would nor could probate it. What equity does is to make the party who, because of the revocation, gets that for which he pays nothing, hold in trust for and convey to the party who would have taken under the will if it had remained unrevoked. It is sometimes said that the will is irrevocable in equity, but the meaning of that simply is that while equity knows that the will has been revoked, it will nevertheless decree that the property shall be held for those who would have taken if the will had not been revoked." 28 Harv. Law Review, 249, 250.

If a contract of this nature conforms to the statute of frauds or is not subject thereto, its breach entitles the promisee to an action at law for damages (*Day* v. *Washburn*, 76 N. H. 203), and "Wherever the sole beneficiary of a contract may sue upon it, the third person who by the contract was to receive a legacy or devise may present a claim against the promisor's estate or sue for the contract's breach." 28 Harv. Law Rev. 251.

The fact that Electa and Charles made mutual wills is not in itself evidence of an agreement not to revoke them. 1 Jarman, Wills (7th *ed.*), *p.* 44. "The vital question is, Was it agreed by them that the wills should remain irrevocable after the death of either? For the solution of this we must look to the extraneous testimony, keeping in mind that, to establish an agreement, the proofs must be clear and convincing. The contract may be found in an express promise, or

inferred, as a conclusion of fact, from the circumstances surrounding the parties." *Tooker* v. *Vreeland*, 92 N. J. Eq. 340, 343.

A finding would be justifiable that Charles' acquiescence in Electa's statement that he would do "what she wanted" in his will amounted to an implied promise, for one who keeps silent, knowing that his silence will be deemed assent, "should not be allowed to deny the natural interpretation of his conduct." 1 Williston, Contracts, *s.* 91, *p.* 172. See also *Decatur* v. *Cooper*, 85 N. H. 250, 256; *Conway &c. Bank* v. *Pease*, 76 N. H. 319, 328; *Concord Coal Co.* v. *Ferrin*, 71 N. H. 33, 35; *Fogg* v. *Portsmouth Atheneum*, 44 N. H. 115. True, the further findings that "Electa and Charles did not want to tie the property up" and that "each, because of the personal knowledge of the other's natural frugality and feelings toward Mary, had no fear the property would be dissipated" seem to indicate that the arrangement was merely one of trust and confidence. See *In re Oldham*, [1925] Ch. 75, 88.

On the other hand, the court has found that Electa and Charles had a "common intention and purpose" that all the property that remained "after the death of both was to go to Mary, which intention . . . they mutually expected to perform and carry out," and that Charles had stated to neighbors and friends "that his mother had given him the property his lifetime; that he was holding it in trust; that he was to have the use of it as long as he lived, and then it was going to his sister; that his affairs were all settled; that he had made his will, and was holding what he had his lifetime, and that it was all to go to Mary when he was through; that his mother wanted it so, and he had so agreed and arranged with her, and intended to carry it out." The court has also found that Charles told Mary herself that "the arrangement was his mother's wish, as well as his own, that he had promised her he would carry it out, and intended to do so."

In view of these declarations, receivable as admissions (*Hurd* v. *Varney*, 83 N. H. 467, 473), the trial court's conclusion that there was "no evidence of any express contract between Charles and Electa that they would not change either of the two simultaneous wills" cannot be sustained. If from what was said and done Electa reasonably understood that Charles agreed to leave his estate to Mary by will in consideration of the will Electa made, then the appellant is entitled to the estate, but in the absence of such an agreement, she has no rights.

On the findings the presiding justice ruled that "no part of the property was impressed with a trust." Obviously, no ruling on the

subject could properly be made in the absence of a finding as to the existence or non-existence of the alleged contract. The appellant duly excepted to the ruling, and the exception is sustained.

In this state the rights of beneficiaries are enforced in equity. *Toner* v. *Long*, 79 N. H. 458, 460, 461, and cases cited; *Roberts* v. *Rowe*, 75 N. H. 36. "A court of equity is the appropriate forum" for enforcing such rights, but any procedure which requires the joining of all interested parties meets the necessities of the case. 1 Williston, Contracts, *ss.* 358, 359.

The assets of the estate consist solely of bank deposits and bonds. A special administrator with the will annexed has been appointed. The ultimate inquiry is whether the appellee or appellant is entitled to the entire assets in the hands of the administrator. All interested parties have appeared. Under such circumstances there can be no practical objection to holding that the appellant's claim is a "demand" within the meaning of P. L., *c.* 303, *s.* 12.

*New trial of appeal from commissioner's report.*

*Other appeals dismissed.*

All concurred.