DONALD G. RAPE, CAROLINE C. RAPE AND LARRY A. RAPE v. WOODROW W. LYERLY AND WIFE, SUDIE D. LYERLY, KATHERINE L. MACK AND HUSBAND, PHILIP MACK AND A. GRAY LYERLY

No. 94

(Filed 26 June 1975)

1. **Frauds, Statute of § 7; Wills § 2— contract to devise land —writing required**

   Although an oral contract to devise land is unenforceable, a valid written contract to devise land is enforceable in equity.

2. **Wills § 2— contract to devise — obligation required to be stated in will**

   The mere exercise of the statutory right to dispose of one's property at death is not of itself evidence that the disposition directed is compelled by a contractual obligation; rather, the writing must show the promise or obligation which the complaining party seeks to enforce.

3. **Frauds, Statute of § 7; Wills § 2— contract to devise real property — sufficiency of memorandum**

In an action to enforce an alleged agreement to devise real property for a stated consideration upon specified conditions, the memorandum upon which plaintiffs relied was sufficient as a memorandum to devise for the purposes of the statute of frauds where the memorandum designated the property to be devised, identified the parties, set forth their respective obligations as consideration for their contract, and was signed by the party to be charged therewith; moreover, being in the form of a will, the memorandum fixed the precise manner in which the testator was to dispose of his real property in performance of his obligations under the contract.

4. **Wills § 2— contract to devise land — promise to care for testator — performance of obligation**

Evidence was sufficient to support the jury's findings that testator contracted to devise his real property to his daughter and that the daughter performed her obligations as contemplated by the contract where such evidence tended to show that testator's will contained a provision devising his real property to the daughter upon her obligation to care for testator and his wife during their lives and to pay to three other children sums totalling $8000, the daughter did live with testator and care for him and his wife until the daughter died, and testator expressed to many people his satisfaction with the daughter's care of him.

5. **Wills § 2— contract to devise — death of promisee — substitution of parties — contract continued**

Even though a contract is one which would terminate at the promisee's death, the promisor may waive this feature of the contract and does so where he permits others, associated with the promisee in his lifetime in rendering the performance, to continue after his death and accepts such performance without giving notice within a reasonable time of an intention to consider the obligation as ended.

6. **Wills § 2— contract to devise — death of promisee — substitution of promisee's family**

In an action to enforce an alleged agreement by testator to devise his real property to his daughter Mildred upon her obligation to care for him and his wife and to pay his other three children specified sums, evidence was sufficient to support the jury's finding that, following the death of Mildred, care was furnished testator and his wife by Mildred's husband and children as contemplated by the contract until both died and that testator accepted such services in fulfillment of the agreement.

7. **Wills § 8— revocation — contractual provisions irrevocable**

All wills are by nature ambulatory, and thus their provisions may be changed prior to death by the maker unless by contractual provisions others' rights thereunder become fixed; in other words, a will is revocable only to the extent that the testator has not contracted to make it irrevocable.

Rape v. Lyerly

8. Wills § 60— "in terrorem" clause — irrelevance — action brought in good faith

An "in terrorem" clause in testator's 1969 will was irrelevant in respect of the claim asserted by plaintiffs in this action, since the claim they asserted was under testator's 1959 rather than 1969 will; also, there was ample evidence to support the jury's finding that this action was brought by plaintiffs in good faith.

9. Executors and Administrators § 19; Limitation of Actions § 4— contract to devise land — three-year statute of limitations applicable

Plaintiffs were not required to commence this action within the time prescribed in G.S. 28-112 since they asserted no claim against the estate of testator; rather plaintiffs asserted present equitable ownership of testator's real property under a 1959 contract to devise, and the applicable statute of limitations was the three-year statute for breach of contract, G.S. 1-52(1), which did not begin to run until testator's death.

10. Equity § 2— contract to devise land — laches in bringing action for breach — insufficient evidence of changed circumstances

There was no change of circumstances sufficient to invoke the doctrine of laches in an action to enforce an alleged agreement to devise real property where the evidence tended to show that one defendant read the 1959 will which contained the promise to devise shortly after it was made, all defendants knew that plaintiffs had been promised certain real property upon the death of testator, one defendant was fully aware that a subsequent will changed the provisions of the prior will to the detriment of plaintiffs, all defendants were fully advised of plaintiffs' claim and the basis therefor shortly after testator's death, and plaintiffs continued in possession of the subject property as they had prior to testator's death.

11. Evidence § 11; Rules of Civil Procedure § 19— father of plaintiffs — no legal pecuniary interest — testimony of transaction with decedent admissible — father not necessary party

In an action to enforce an alleged agreement by testator to devise his real property to plaintiffs' mother, a child of testator's who predeceased him, upon her obligation to care for testator and his wife until their deaths, the rights of plaintiffs were determinable as if testator had died leaving a valid, probated will in which he devised his property according to the alleged agreement. Had he done so, plaintiffs would take as the issue of their mother by virtue of G.S. 31-42(a); therefore, their father had no pecuniary legal interest in plaintiffs' real property, and his testimony concerning what was done when testator produced the will containing the alleged agreement was not incompetent under G.S. 8-51, nor was the father a necessary party to this action.

Justices COPELAND and EXUM did not participate in the hearing or decision of this case.

APPEAL of right under G.S. 7A-30(2) from the decision of the Court of Appeals reported in 23 N.C. App. 241, 208 S.E.

2d .712 (1974), which found "No Error" in the trial before *Judge Crissman* at the 28 January 1974 Session of ROWAN Superior Court, docketed and argued in the Supreme Court at the Fall Term 1974 as Case No. 125.

This is an action to enforce an alleged agreement by James Richard Lyerly to devise his real property in Steele Township, Rowan County, for a stated consideration and upon specified conditions.

Plaintiffs are the children of B. M. Rape (Basil) and Mildred Lyerly Rape (Mildred), deceased daughter of James Richard Lyerly (Mr. Jim) and his wife, Pearl S. Lyerly (Miss Pearl). Mildred died 3 February 1965. Miss Pearl died in October 1966. Mr. Jim died 23 November 1970 at the age of 85 years and six months.

Defendants Woodrow W. Lyerly (Woodrow), Katherine Lyerly Mack (Katherine), and A. Gray Lyerly (Gray), are children of Mr. Jim and Miss Pearl.

Plaintiffs base their claim upon the following provisions of a writing duly executed by Mr. Jim on 21 March 1959 as an attested will, referred to hereinafter as "the 1959 will."

"Fourth: It is my opinion that $16,000.00 is a fair market value of my real property lying in Steele Township, Rowan County, N. C. Since my daughter, Mildred Lyerly Rape and my son, Woodrow W. Lyerly have obligated themselves to care for my wife and myself during our lifetime, all of my real property, I give and bequeath to Mildred Lyerly Rape upon payment by her to the following: 1st. To my son, Woodrow W. Lyerly the sum of $6,000.00 2nd. To my son, Gray Lyerly the sum of $1,000.00 3rd. To my daughter, Katherine Lyerly Mack the sum of $1,000.00."

Plaintiffs alleged the obligation to care for Miss Pearl and Mr. Jim during their lifetime was fully performed, but that Mr. Jim breached his agreement by executing an attested will on 4 September 1969, probated as his Last Will and Testament in November of 1970, in which he attempted to devise the major portion of his real property to defendants. They further alleged defendants' refusal to convey the property devised to their mother, Mildred, in the 1959 will after plaintiffs' demand therefor and the tender by them of all monies specified therein.

Plaintiffs claim all of Mr. Jim's real property under the provisions of the 1959 will.

Defendants denied plaintiffs' essential allegations and, as further defenses, pleaded (1) the statute of frauds, (2) a statute of limitation, and (3) laches. They claim the major portion of Mr. Jim's real property as devisees under the 1969 will.

In the 1959 will, Mr. Jim bequeathed to his wife, Miss Pearl, his household goods and his bank account with the Northwestern Bank of Cleveland, N. C. He bequeathed to Woodrow W. Lyerly (Woodrow), his son, and to Basil, his son-in-law, all other personal property belonging to his estate, "including livestock, farming machinery, and a joint bank account in the names of Woodrow W. Lyerly, B. M. Rape and [himself] with the First National Bank, Mooresville, North Carolina." He appointed Woodrow and Basil as co-executors.

In the 1969 will, Mr. Jim devised, or attempted to devise, his real property in Steele Township, Rowan County, as follows: He devised 27½ acres to Woodrow. He devised a 71-acre tract in the following proportions: "(a) One-third (⅓) interest to [his] daughter, Katherine L. Mack; (b) One-third (⅓) interest to [his] son, A. Grey (sic) Lyerly; (c) One-third (⅓) interest to the surviving issue of [his] deceased daughter, Mildred Lyerly Rape, per stirpes and not per capita." He appointed his daughter, Katherine L. Mack, as executrix.

Uncontradicted evidence discloses the 1959 will was executed by Mr. Jim under the circumstances stated below.

Mildred and Basil were married 14 July 1943. Prior to Basil's return from his service with the armed forces in 1945, Woodrow and his wife had been living with Mr. Jim and Miss Pearl. Upon Basil's return, Woodrow and his wife moved to their own house and Basil and Mildred moved in with Mr. Jim and Miss Pearl.

Mitchell Cress, one of the witnesses to the 1959 will, testified that Mr. Jim told him Woodrow moved out because "the families couldn't get along"; that "the personalities of the two ladies clashed."

Woodrow, Mr. Jim and Basil began joint farming operations in the spring of 1946. Initially they farmed Mr. Jim's land and Woodrow's land. Basil acquired land in 1949 and in 1957. These tracts, and also two leased tracts, were included in their

joint farming activities. These activities included the operation of a dairy, a venture conducted largely by Basil. The three maintained a joint bank account, to which reference was made by Mr. Jim in the 1959 will. Each had authority to write checks on this account for his personal obligations as well as those of the business. Annually, there was an accounting and settlement with reference to the interest of each partner.

Prior to the execution of the 1959 will, only the downstairs portion of Mr. Jim's house was in use. A large hall ran from front to back. There was a front bedroom, a side bedroom, a living room (den), a dining room, and a kitchen. The side bedroom was occupied by Mr. Jim and Miss Pearl. The front bedroom was occupied by Mildred, Basil, and their three children. In 1959 Larry was about 14; Donald was about 10; and Caroline was about 8. The space upstairs, adequate for three rooms, had never been finished. In view of their compelling need for more room, Mildred and Basil were making plans to build a house on their own land. Shortly before the execution of the 1959 will, Basil approached Lewis Klutz, a neighbor and also a carpenter-builder, with reference to building a new house for his family, stating he was "going to move out on his own." Plaintiffs, the Rape children, were "looking forward to . . . being able to have their friends in and not be tied all the time."

As the building plans of Mildred and Basil took shape, Mr. Jim made them a proposition. He said to Basil: "Now, if y'all will stay here and live with me and mamma so long as we live, you can do anything you want to this house and we'll make you safe." He also told Basil that he was going to live with his family; "that he didn't have any other child he could live with." In consequence of this conversation, the Rapes abandoned their plans to build on their own land.

The 1959 will was signed by Mr. Jim in "Tom Ervin's store at Bear Poplar." Mitchell Cress and Walter Ervin, neighbors and friends, were witnesses.

Cress testified that, when Mr. Jim asked him to witness his will, he told him "he was making the will to protect Basil and Mildred for staying and taking care of him and his wife." He further testified to statements made by Mr. Jim in his own yard on an occasion when he (Cress), Woodrow and Basil were present. He said that Mr. Jim then stated he was "leaving the

farm to Basil and Mildred with the other provision for Woodrow to receive compensation for what he might contribute for their upkeep."

Ervin testified that, on an occasion after the 1959 will was signed, Mr. Jim told him he had made the will "to take care of the Rape family for the work that they were doing on their house and they were supposed to take care of them the rest of their lives and he wanted to protect them with this will . . . that he gave the will to Basil after he signed it."

Basil testified that, after he had executed the 1959 will, Mr. Jim called Woodrow, Mildred and Basil together and showed it to them; that each read it and expressed satisfaction; and that Woodrow added, "Me and my wife can't live here with my mother and daddy. . . . [I]f you [Basil] and Mildred would live here with mother and daddy as long as they live, it's perfectly satisfactory with me." Thereupon Mr. Jim handed the 1959 will to Basil. It was put in Basil's safety deposit box and remained there until Mr. Jim's death.

Robert Kennerly, a nephew of Miss Pearl, testified to statements made by Mr. Jim in 1959 when Mr. Jim and Miss Pearl were visiting Kennerly's parents. According to Kennerly, when the subject of Mr. Jim's will and future living arrangements for himself and Miss Pearl were under discussion, Mr. Jim said "that he wasn't living by himself and he couldn't live with Woodrow and Sudie, he had tried that, and he couldn't live in Mooresville because that was too far away from home and he just couldn't live in town and he just couldn't live with Katherine, and he said Gray was in California and he couldn't live with him, and he wasn't living by himself, and he said that Basil and Mildred had got a house planned and were going to move and build on their farm, and he said he told them if they moved they could just build another room because he wasn't living by himself with Aunt Pearl, and Aunt Pearl was present at that time, and he told that on a couple of occasions up at our house."

Plaintiffs' evidence tends to show the following:

Shortly after the 1959 will was executed Basil engaged Klutz to completely "overhaul" the old house in which Mr. Jim and Miss Pearl and the five members of the Rape family were then living. According to Klutz, when he started work "Mr. Jim walked up and he stated that he wanted the house fixed just

like Basil and Mildred wanted it; that it was their house; that he had willed it to them."

The renovation project included the following: A new roof was put on the house. The upstairs area was completed and made into three rooms, a bedroom for Larry and Donald, a bedroom for Caroline, and a storage or junk room. New flooring was put in throughout the house. The flooring in the downstairs bedrooms and large hall was cyprus wood. Elsewhere the flooring was pressed wood overlaid with tile. All rooms were sheetrocked and celotexed. Cabinets were built in the kitchen. The old doors were replaced by 21 wood doors and 3 storm doors. Twenty-six storm windows were installed. Structural changes included the enlargement of the "den" by using a portion of the hall. For the first time, closets were built. Prior to the renovation, in Miss Pearl's room a stick nailed across a corner of the room with a curtain hanging from it was the only place for her clothes. A closet for the use of Mr. Jim and Miss Pearl was built in the back hall. The porches on each of the three sides of the house were ceiled. The carport was roofed and ceiled. A half bathroom was added to the back porch. Necessary repairs were made throughout the house. The total cost, $6,000.00 or more, was paid by Basil.

In 1961 Mr. Jim, then about 76, had a heart attack. Thereafter, he didn't participate actively in the farming operations. However, his health remained good until shortly before his death in 1970. He drove a car, frequently visited his relatives, friends and neighbors, and was visited by them. He was interested and active in community and church gatherings and affairs.

After Mr. Jim's heart attack on 7 July 1961, Woodrow and Basil executed a formal partnership agreement "for the purpose of engaging in the general farming business, including but not limited to the operation of a dairy, a beef herd, and raising various commodities for market and farm use." In general, this agreement called for equal contributions to the capital of the partnership, equal rights to the assets and profits thereof, and equal authority in respect of control and purchases. The "FOURTH" and "NINTH" paragraphs thereof provided that either partner could withdraw from the partnership at any time by offering to sell his share to the other at a specified price. In such case, the other partner was obligated to buy or sell at that price.

Rape v. Lyerly

Each partner made withdrawals from the partnership account for personal as well as business obligations. An accounting was made at the end of each calendar year. The partnership agreement remained in effect until terminated as of 1 August 1969 under the circumstances described below.

From 1943 until her death in 1966 Miss Pearl was a semi-invalid. She weighed about 200 pounds and spent most of her time in bed. If she was opposed "in any way" she had "one of her tantrums." It seemed to Basil that her sickness "was more of a mental condition than it was a physical condition."

Mildred died 3 February 1965. During the period of nearly six years after the execution of the 1959 will, Mildred had "participated in the operation of the house . . . [and] was the sole person that looked after the household duties, the cooking and the care of Miss Pearl. . . . [S]he was able to be around and do most things until her death except for a short period of time that she was in the hospital on a couple of occasions. She cooked for Miss Pearl and Mr. Jim and she did the washing and ironing for them. As the years passed, the children became very active in the duties on the farm and the daughter helped in the home. After Mildred died, Caroline and Basil ran the house."

Mrs. Nonnie Norman was employed as a servant in the Rape-Lyerly home, working two days a week. She was first employed when Mildred was alive and able to do the cooking and care for Miss Pearl. During this period Mrs. Norman did the "heavy housework," such as washing, ironing, and cleaning. After Mildred's death, Mrs. Norman cleaned the room occupied by Miss Pearl and Mr. Jim and later by Mr. Jim alone. She did some of the cooking on the days she was there, in addition to the washing, ironing and cleaning she had been doing when Mildred was alive.

Testimony as to what occurred shortly after Mildred's death includes the following:

Mrs. George Gardner, whose husband was related to Miss Pearl, testified: "He [Mr. Jim] came to our house not long after Mildred had died. . . . I said, 'What's Basil and the children going to do now?' He said, 'They will have to stay here—live with us and take care of mama and me. We have papers drawn up to that effect.' "

Robert Kennerly testified he was present when Mrs. Gardner asked Mr. Jim what Basil and the children were going to

do. According to Kennerly, Mr. Jim said: "Oh, he can't leave. We have got an agreement. He's got to stay with us . . . they can't leave—they can't move, they have got to look after us."

W. Grady Lyerly and Mrs. Fannie Lyerly Secrest, brother and sister of Mr. Jim, testified to frequent visits with Mr. Jim at their homes and at the Lyerly-Rape home, during the period between the execution of the 1959 will and Mr. Jim's death. Each testified Mr. Jim had often stated that he had given the property to the Rape family because of their agreement to take care of his wife and himself as long as they lived. Mrs. Secrest testified: "He [Mr. Jim] would say, 'Fannie, my parents gave me the homeplace to take care of them and I in turn have given it to Mildred and Basil to take care of me and Pearl.'" These witnesses testified that Mr. Jim continuously praised the manner in which the Rape family had taken care of him and Miss Pearl after Mildred's death and of him after Miss Pearl's death. Mr. Jim's neighbors and friends testified to like effect.

After Mildred's death, according to Mrs. Secrest, Mr. Jim said: "'We loved Mildred and we miss Mildred and we were heartbroken when Mildred died but so far as me and mama are concerned, we really never had any difference in the way we live. Basil and Caroline have seen to it that we have had the same care that we had when Mildred was here.' He said, 'We could really tell no difference.' He says, 'Now, I don't want you to get me wrong, that it didn't break our hearts to give our daughter up but we have been treated with the same kind of care since she went away as we were while she was here.' That's his words."

During the subsistence of the partnership, obligations of Woodrow's family and of the Rape-Lyerly household, including grocery bills, the wages of domestic servants, etc., were paid from the partnership funds. Too, the taxes on all lands involved in the partnership operations, including Mr. Jim's farm, were paid from the partnership. Partnership funds also provided Mr. Jim with an automobile for his personal use. After termination of the partnership, all expenses of the Rape-Lyerly household, including grocery bills, improvements on the farm, etc., were paid by Basil. A grain bin, which cost $470.00 or $480.00 and was installed on the Lyerly farm, was completed after the termination of the partnership and was paid for by Basil.

The following sequence of events is noted.

By letter dated 16 July 1969, attorneys for Woodrow notified Basil of Woodrow's decision to withdraw from their partnership agreement of 7 July 1961. They advised Basil of Woodrow's offer to sell his interest in the partnership for $40,000.00 and demanded that Basil notify *them* of his decision to buy or sell by 12 o'clock noon on Saturday, 26 July 1969. Basil was directed not to contact Woodrow "or any member of his family."

Basil elected to buy Woodrow's interest in the partnership and pay him the sum of $40,000.00. The contract of sale, dated 9 August 1969, became effective as of 1 August 1969. It provided for the payment of $10,000.00 cash; for the immediate transfer to Woodrow of $15,000.00 "from the retains held by the Rowan Dairy (Long Meadow)"; and for the execution of a note for $15,000.00 payable on or before 1 September 1969.

The Last Will and Testament of Mr. Jim under which defendants claim was executed under date of 4 September 1969; and, on the same date and occasion, Mr. Jim executed and delivered a general power of attorney to his daughter, Katherine L. Mack. Both documents were drafted by Mrs. Frances F. Rufty, an attorney of Salisbury. In the negotiations for Woodrow's withdrawal from the partnership he was represented by a Statesville law firm.

After the 1969 will and power of attorney were signed, Mr. Jim delivered them to Mrs. Mack. They were placed in her husband's safe. The will was kept there until Mr. Jim's death. Three or four days before Mr. Jim's death, Mrs. Mack, exercising the power of attorney, "cleaned out" Mr. Jim's bank account. Upon Mr. Jim's death, the 1969 will was probated. Mrs. Mack qualified as executrix and administered Mr. Jim's personal estate, including the funds withdrawn from his bank account shortly before his death.

After the execution of the 1969 will, Mr. Jim continued to live as theretofore, a member of the Rape-Lyerly household, until his death on 23 November 1970. Neither Basil nor plaintiff had any knowledge or information concerning the 1969 will. During this period Basil built a trench silo on the Lyerly farm at a cost to him of around $1,100.00. Mr. Jim was present when the silo was laid off.

There was no evidence that Miss Pearl or Mr. Jim ever complained to Basil or any member of the Rape family in

respect of the care they received over the years. All the evidence is to the effect that they accepted until death the care the Rape family continued to provide.

Defendant A. Gray Lyerly did not testify. Apparently he resided in California. Defendant Woodrow W. Lyerly (Woodrow) did not testify. Nor did any member of his family testify.

Defendants offered three witnesses: (1) Mrs. Rufty, (2) Newberry Hall, a neighbor, and (3) defendant Katherine L. Mack. Mrs. Rufty testified as to her contacts and conversations with Mr. Jim when she drafted the 1969 will. Mr. Hall testified briefly to visiting Mr. Jim and Miss Pearl. According to Hall, "[Mr. Jim] never talked to me about his business. I never heard him talking about his business to anyone." His testimony lacked pertinent probative value.

Mrs. Mack testified that Mr. Jim made statements to her to the effect that he wanted to change his will because there was no one there at the homeplace to care for him and he didn't think the will was fair the way it was. She testified that she "never told Basil or any of the Rape family about the [1969] will because [her] father told [her], to tell no one." She further testified: "He [Mr. Jim] said that I would have a terrible time administering the estate because Basil was the most unreasonable man that he had ever tried to deal with in his life and that Basil had everybody in the community fooled and that Basil thought he had fooled him but that he had not fooled him, but those were his exact words."

The parties stipulated that described tracts of land in Steele Township, Rowan County, constituted the real property owned by Mr. Jim. They further stipulated that plaintiffs tendered to defendants "all monies provided for" in the 1959 will and that defendants refused plaintiffs' demand that they convey to plaintiffs the real property Mr. Jim had attempted to devise to them in the 1969 will.

The issues submitted, and the jury's answer thereto, were as follows:

"1. Did James Richard Lyerly enter into a contract to leave his real property by will to Mildred Lyerly Rape in return for care of himself and his wife during their lifetime and upon the condition that Woodrow W. Lyerly be paid the sum of $6,000.00;

Gray Lyerly the sum of $1,000.00 and Katherine Lyerly Mack the sum of $1,000.00?

"Answer: Yes.

"2. Did Mildred Lyerly Rape perform, during her lifetime her obligations as contemplated by the contract?

"Answer: Yes.

"3. Following the death of Mildred Lyerly Rape and until the death of James Richard Lyerly and his wife, was care for James Richard Lyerly and his wife furnished by or on behalf of the plaintiffs as contemplated by the agreement, and did James Richard Lyerly accept such services in fulfillment of the said agreement?

"Answer: Yes.

"4. Was this action instituted by the plaintiffs in good faith?

"Answer: Yes."

The court entered judgment which, after recitals, inclusive of the issues, answers thereto, and stipulations, provided:

"IT IS NOW THEREFORE ORDERED, ADJUDGED AND DECREED as follows:

"1. A trust in favor of the plaintiffs Donald G. Rape, Caroline C. Rape, and Larry A. Rape, the children of Mildred Lyerly Rape, is hereby imposed upon all right title and interest of the defendants in the following described real property, devised to the defendants by the last will and testament of James Richard Lyerly:

DESCRIPTIONS OMITTED

"2. It appearing to the Court that the plaintiffs have deposited in the office of the Clerk of Superior Court for Rowan County, the sum of $6,000.00 for the benefit of Woodrow W. Lyerly, the sum of $1,000.00 for the benefit of Katherine L. Mack and the sum of $1,000.00 for the benefit of A. Gray Lyerly, it is hereby ORDERED ADJUDGED and DECREED that all right, title and interest of the defendants in the real property hereinabove described is divested from the defendants and is hereby vested in the plaintiffs, Donald G. Rape, Caroline C. Rape, and Larry A. Rape.

"3. The Clerk of Superior Court is directed to disburse the foregoing sums to the defendants upon the occurrence of any of the following events: the abandonment of any appeal which may be taken by the defendants from this judgment, or a final determination of this action in favor of the plaintiffs, following any appeal, confirming the plaintiffs' title to the property herein described. In the event that it should finally be determined that the plaintiffs are not entitled to the interests of the defendants in the property heretofore described, the Clerk of Superior Court shall refund the sums so deposited to the plaintiffs.

"4. The defendants shall recover nothing upon their Counterclaim.

"5. The defendants shall pay the costs of this action, to be taxed by the Clerk."

Defendants excepted and appealed, assigning as error (1) the denial of their motion to dismiss for failure to join Basil as a party; (2) the denial of their motions for summary judgment and for a directed verdict; and (3) errors committed in the conduct of the trial.

Upon defendants' appeal, a majority of the hearing panel of the Court of Appeals found "No Error." Judge Hedrick noted his dissent.

*Kluttz and Hamlin by Lewis P. Hamlin, Jr., Richard R. Reamer, and Malcolm B. Blankenship, Jr., for plaintiff appellees.*

*Collier, Harris, Homesley, Jones & Gaines by Walter H. Jones, Jr., for defendant appellants.*

SHARP, Chief Justice.

We consider first defendants' contentions (1) that the evidence was insufficient to warrant a finding that Mr. Jim contracted to devise his real property as alleged by plaintiffs and (2) that the writing signed by Mr. Jim was insufficient to comply with G.S. 22-2, our statute of frauds.

[1] Although an oral contract to devise land is unenforceable, *Pickelsimer v. Pickelsimer*, 257 N.C. 696, 698, 127 S.E. 2d 557, 559 (1962), a valid written contract to devise land is enforceable in equity. *Schoolfield v. Collins*, 281 N.C. 604, 615-16, 189 S.E. 2d 208, 215 (1972).

"An annotation following *Naylor v. Shelton*, 102 Ark. 30, 143 S.W. 117, Ann. Cas. 1914A, 394 (1912), contains this statement: '[W]hile a court of chancery is without power to compel the execution of a will, and therefore the specific execution of an agreement to make a will, cannot be enforced, yet if the contract is sufficiently proved and appears to have been binding on the decedent and the usual conditions relating to specific performance have been complied with, then equity will specifically enforce it by seizing the property which is the subject matter of the agreement, and fastening a trust on it in favor of the person to whom the decedent agreed to give it by his will.' Ann. Cas. 1914A at 399. This statement is quoted with approval in *Stockard v. Warren, supra* at 285, 95 S.E. at 580, and in *Clark v. Butts,* 240 N.C. 709, 714, 83 S.E. 2d 885, 889 (1954)." *Schoolfield v. Collins, supra* at 616, 189 S.E. 2d at 215.

[2]   Plaintiffs rely upon the 1959 will, specifically the paragraph thereof designated "FOURTH," as a memorandum of a valid contract to devise land in compliance with G.S. 22-2. Its sufficiency *as a contract* must be determined by application of legal principles stated by Justice Rodman in *McCraw v. Llewellyn,* 256 N.C. 213, 217, 123 S.E. 2d 575, 578, 94 A.L.R. 2d 914, 920 (1962), as follows: "The mere exercise of the statutory right to dispose of one's property at death is not of itself evidence that the disposition directed is compelled by a contractual obligation. The writing must show *the promise* or *obligation* which the complaining party seeks to enforce. (Citations omitted.)" (Our italics.)

· In *Mayer v. Adrian,* 77 N.C. 83, 88 (1877), Justice Bynum, for the Court stated: "The agreement must adequately express the *intent* and *obligation* of the parties. Parol evidence cannot be received to supply anything which is wanting in the writing to make it the agreement on which the parties rely." (Our italics.) This statement is quoted with approval in *Chason v. Marley,* 224 N.C. 844, 845, 32 S.E. 2d 652, 653 (1945), and *McCraw v. Llewellyn, supra* at 217, 123 S.E. 2d at 578, 94 A.L.R. 2d at 920. *See* Restatement, Contracts, Second, Tentative Drafts Nos. 1-7, Revised and Edited § 207 (1973).

[3]   The memorandum on which plaintiffs rely designates the property to be devised, identifies the parties, sets forth their respective obligations as consideration for their contract, and is signed by Mr. Jim, the party to be charged therewith. Hence, it was sufficient as a memorandum to devise "for the purposes

of the statute of frauds." 72 Am. Jur. 2d, Statute of Frauds § 304 (1974) ; Annot., "Statute of frauds: will or instrument in form of will as sufficient memorandum of contract to devise or bequeath," 94 A.L.R. 2d 921, 931-34, 947-954. Moreover, being in the form of a will, the memorandum fixes the precise manner in which Mr. Jim is to dispose of his real property in performance of his obligations under the contract. The contract involved in *Bumpus v. Bumpus,* 53 Mich. 346, 19 N.W. 29 (1884), cited by defendants, was held unenforceable because of the vagueness of the obligations of the promisee.

In the Restatement, Contracts, § 207 at p. 279 (1932) and Restatement, Contracts, Second, *supra* at 464, after stating the general requisites of a memorandum, in order to make enforceable a contract within the Statute of Frauds, this illustration is given: "A makes an oral contract with B to devise Blackacre to B, and executes a will containing the devise and a recital of the contract. The will is revoked by a later will. The revoked will is a sufficient memorandum to charge A's estate."

[4] There was ample evidence to support the jury's affirmative answer to the first issue, a finding that Mr. Jim contracted to devise his real property to Mildred for the consideration and upon the conditions set forth in the paragraph designated "FOURTH" in the 1959 will. There was also ample evidence to support the jury's affirmative answer to the second issue, a finding that Mildred, during her lifetime, performed her obligations as contemplated by the contract.

We note here that Mildred, Basil, and the Rape children, had lived with Mr. Jim and Miss Pearl from 1945 until 1959. The evidence discloses that in 1959 (1) the five members of the Rape family could not continue to live in the Lyerly house unless additional rooms were provided; and that (2), having lived with Mildred, Basil, and the Rape children for the past fourteen years, Mr. Jim and Miss Pearl knew the kind of care they might reasonably expect in the days ahead, and they desired to continue the relationship with that family.

We further note that, beginning in 1946, the expenses of the two households, Woodrow's household and the Rape-Lyerly household, were paid from partnership funds, and that this continued throughout the subsistence of the formal partnership agreement between Woodrow and Basil, that is, until 1 August 1969. The evidence discloses that these payments, which bene-

fitted Mr. Jim and Miss Pearl directly or indirectly, constituted the care provided by Woodrow in discharge of *his* obligations under the paragraph designated "FOURTH" of the 1959 will.

Defendants contend, however, that even if the paragraph designated "FOURTH" was a valid contract to devise when Mr. Jim signed the 1959 will, it called for *the personal services* of Mildred and therefore terminated at Mildred's death.

Obviously the parties contemplated that Mildred would perform the services required to care for the personal needs of her mother and father in the home. Her health was good when the 1959 will was executed. Her malignancy was discovered in 1961. Successive recurrences after surgery ultimately caused her death in April of 1965.

To support their contentions, defendants cite *Siler v. Gray,* 86 N.C. 566 (1882), and *Stagg v. Land Co.,* 171 N.C. 583, 89 S.E. 47 (1916). These decisions are cited in *Peaseley v. Coke Co.,* 282 N.C. 585, 596, 194 S.E. 2d 133, 141 (1973), in support of the statement therein contained that many courts have held that contracts calling for the personal services of a salesman do not survive his death, "the rationale being that the death of the person who was to perform the personal services makes further performance impossible."

[5]  Notwithstanding, "even though the contract is one which would terminate at the promisee's death, the promissor may waive this feature of the contract and does so where he permits others, associated with the promisee in his lifetime in rendering the performance, to continue after his death and accepts such performance without giving notice within a resonable time of an intention to consider the obligation as ended." 94 C.J.S., *Wills* § 117(d), p. 879 (1956). *Accord,* 57 Am. Jur. *Wills* § 175, p. 155 (1948); 1 Page on Wills, Section 10.25 (Bowe-Parker rev. 1960); *Soper v. Galloway,* 129 Iowa 145, 105 N.W. 399 (1905); *Prater v. Prater,* 94 S.C. 267, 77 S.E. 936 (1913). For the factual situation in *Soper, supra,* and for apposite quotations from the opinions in *Soper* and *Prater, supra,* reference is made to Judge Britt's opinion for the Court of Appeals. In *Bourget v. Monroe,* 58 Mich. 563, 25 N.W. 514 (1885), and in *Parker v. Macomber,* 17 R.I. 674, 24 A. 464, 16 L.R.A. 858 (1892), decisions cited by defendant, the promissor repudiated the contract to devise upon the death of the person whose serv-

ices constituted the consideration for the contract and refused to accept the services of others in lieu thereof.

[6]  For present purposes, we assume that upon Mildred's death, Mr. Jim had the right to terminate the contract to devise on the ground that his obligation to devise depended upon the rendition of personal services by Mildred; and we further assume that neither Basil nor plaintiffs had *a legal right* to substitute their services for the services of Mildred. Suffice to say, Mr. Jim did not terminate the contract. On the contrary, the services which Mildred would have performed were rendered by Basil and plaintiffs and accepted by Mr. Jim and Miss Pearl. Moreover, there was plenary evidence that Mr. Jim was outspoken in his praise of the services he and his wife received both before and after Mildred's death and by him until his own death. Instead of seeking to terminate the contract embodied in the 1959 will, the evidence is to the effect that Mr. Jim considered that Basil and plaintiffs were obligated to render and provide the services Mildred would have rendered and provided had she outlived her parents. There was ample evidence to support the jury's affirmative answer to the third issue, a finding that, following the death of Mildred, care was furnished Miss Pearl and Mr. Jim by or on behalf of plaintiffs as contemplated by the contract until both died, and that Mr. Jim accepted such services "in fulfillment of the said agreement."

Defendants further contend that, by operation of law and by provisions therein, the 1969 will revoked the 1959 will.

[7]  " 'Revocation' has been defined as the avoiding and invalidating of an instrument which, but for the revocation, would have been the last will and testament of the party by whom it was executed." 95 C.J.S., *Wills* § 262, p. 30 (1957). As stated *In re Estate of Ramthun*, 249 Iowa 790, 798, 89 N.W. 2d 337, 341-42 (1958) : "All wills are by nature ambulatory, and thus their provisions may be changed prior to death by the maker *unless by contractual provisions others' rights thereunder become fixed.* In other words, a will is revocable only to the extent that the testator has not contracted to make it irrevocable. [citations omitted]." (Our italics.)

The applicable legal principles are well stated in Estate of McLean, 219 Wis. 222, 227-228, 262 N.W. 707, 710 (1935), as follows: "A will made under an agreement based upon a valuable consideration is contractual as well as testamentary, and

equity will enforce the provision made for the promisee. A will so made cannot be revoked by the testator so as to defeat the bequest or devise made by it pursuant to his agreement. Nor can the testator destroy the effect of a provision therein so made by making a subsequent disposition by will of the property so devised or bequeathed by the first will. He cannot so avoid his contract which he has performed. His heirs can gain no advantage by his revocation, if he revoke the will, nor can devisees or legatees under a subsequent will gain any. The execution of the will pursuant to the promise creates a trust in the property devised or bequeathed pursuant to the contract which will be enforced in equity against the heirs or those claiming under a subsequent will." These legal principles are applicable and have been applied to factual situations such as that now under consideration. *Nelson v. Schoonover,* 89 Kan. 388, 131 P. 147 (1913) ; *Torgerson v. Hauge,* 34 N.D. 646, 159 N.W. 6, 3 A.L.R. 164 (1916).

In the Annotation, "Right to Revoke Will Executed Pursuant to Contract," 3 A.L.R. 172 (1919), the author states: "The general rule is, therefore, that a will executed pursuant to a contract cannot be revoked so as to relieve the testator of its contractual obligation." In addition to *Nelson, supra,* and *Torgerson, supra,* the following decisions involving factual situations in which personal services performed and to be performed were the consideration for the promise to devise land, are cited in support of the quoted statement: *Bolman v. Overall,* 80 Ala. 451, 2 So. 624, 60 Am. Rep. 107 (1886) ; *Smith v. Tuit,* 127 Pa. 341, 17 A. 995, 14 Am. St. Rep. 851 (1889), Second appeal, *Tuit v. Smith,* 137 Pa. 35, 20 A. 579 (1890) ; *Bruce v. Moon,* 57 S.C. 60, 35 S.E. 415 (1900). Later decisions to the same effect include the following: *Goodin v. Cornelius,* 101 Or. 422, 200 P. 915 (1921) ; *Brock v. Noecker,* 66 N.D. 567, 267 N.W. 656 (1936) ; *White v. Smith,* 43 Idaho 354, 253 P. 849 (1926) ; *Johnston v. Tomme,* 199 Miss. 337, 24 So. 2d 730 (1946). Also see *Remele v. Hamilton,* 78 Ariz. 45, 275 P. 2d 403 (1954), and *Cagle v. Justus,* 196 Ga. 826, 28 S.E. 2d 255 (1943), and cases cited therein.

The 1969 will contained an "in terrorem" clause, providing in part that "if any person entitled to any legacy, bequest or devise under the terms of this Will shall, directly or indirectly, . . . institute any proceedings, suit or action, for the purpose of . . . changing the effect of this Will, wholly or in part, then

and in that event, all the legacies, bequests or devises declared in favor of such person by this Will . . . shall immediately thereupon be revoked and become wholly void and of no effect." Based on this provision, defendants alleged as a counterclaim that plaintiffs, by the institution of this action, had forfeited the rights to which they would have been entitled under the 1969 will.

[8] The counterclaim was properly dismissed since the rights of plaintiffs under the 1959 will had become irrevocable. The "in terrorem" clause in the 1969 will was irrelevant in respect of the claim asserted by plaintiffs in this action. Plaintiffs have asserted no claim under the 1969 will. Also, there was ample evidence to support the jury's affirmative answer to the fourth issue, a finding that this action was brought in good faith. In this connection, see *Ryan v. Trust Co.*, 235 N.C. 585, 588, 70 S.E. 2d 853, 855 (1952) ; and *Haley v. Pickelsimer*, 261 N.C. 293, 134 S.E. 2d 697 (1964).

[9] Defendants further contend plaintiffs did not commence this action within three months from the rejection by defendants' counsel of plaintiffs' claim as set forth in a letter from plaintiffs' attorney to defendants.

G.S. 28-112, on which defendants base their contention, does not apply. These statutes refer to claims of creditors of an estate, payable out of the assets of the estate. Plaintiffs assert no claim against the estate of Mr. Jim. Nor have they filed any claim with the executrix thereof. They assert present equitable ownership of the real property under the 1959 contract to devise, contending the beneficial interest in such real property did not pass under the 1969 will and did not become a part of Mr. Jim's estate.

The three-year statute of limitations for breach of contract, G.S. 1-52(1), did not begin to run until Mr. Jim's death. *Stewart v. Wyrick*, 228 N.C. 429, 432, 45 S.E. 2d 764, 766 (1947) ; *Speights v. Carraway*, 247 N.C. 220, 222, 100 S.E. 2d 339, 341 (1957). This action was commenced well within this limitation.

[10] Defendants, seeking to invoke the equitable defense of laches, contend this action is barred because of plaintiffs' delay in commencing it. The contention is without merit. The doctrine of laches applies only when circumstances have so changed during the lapse of time it would be inequitable and unjust to permit the prosecution of the action. *Teachey v. Gurley*, 214 N.C. 288, 294, 199 S.E. 83, 88 (1938).

According to uncontradicted evidence, Woodrow read the 1959 will shortly after Mr. Jim signed it. To what extent, if any, the other defendants were advertent *to the exact* provisions thereof is unclear. It is implicit in the evidence, however, that the entire Lyerly family knew that the Rapes had been promised the homeplace at Mr. Jim's death. Mrs. Mack was fully aware that the 1969 will changed the provisions of the prior will to the detriment of plaintiffs. All defendants were fully advised of plaintiffs' claim and the basis therefor shortly after Mr. Jim's death. Plaintiffs continued in possession of the subject property. They did not participate in any way in the administration of the personal estate under the 1969 will, nor did they accept any distribution from Mr. Jim's personal estate. This factual situation discloses no change in circumstances sufficient to invoke the doctrine of laches.

[11] Assuming their motion for a directed verdict was properly denied, defendants contend a new trial should be awarded because of errors in the conduct of the trial. They assign as error the admission over their objection of the testimony of Basil concerning what was said and done when Mr. Jim produced the 1959 will, submitted it to Mildred, Basil, and Woodrow, for reading and approval, and delivered it to Basil for safekeeping. They contend that Basil's testimony was incompetent under G.S. 8-51 in that he was a person interested in the outcome of this action against the devisees of Mr. Jim and that he was testifying in his own behalf against those devisees with reference to a personal transaction between himself and Mr. Jim.

For conditions prerequisite to the disqualification of a witness under G.S. 8-51, see *Bunn v. Todd,* 107 N.C. 266, 11 S.E. 1043 (1890); *Peek v. Shook,* 233 N.C. 259, 261, 63 S.E. 2d 542, 543 (1951); *Sanderson v. Paul, supra* at 58-59, 69 S.E. 2d at 158; 1 Stansbury's N. C. Evidence, § 66 (Brandis Rev. 1973).

Parenthetically, we note here that Basil is *not* a party to this action. Defendants' motion to dismiss this action upon the ground that Basil is a necessary party was denied by the judge presiding at the October 1972 Session. We also note that Basil filed in the Court of Appeals a disclaimer of any interest in the real property formerly owned by Mr. Jim. Notwithstanding, the question is whether Basil had a legal pecuniary interest in the event of the action *at the time he was examined as a witness at*

*trial. Sanderson v. Paul,* 235 N.C. 56, 61, 69 S.E. 2d 156, 160 (1952).

It may be conceded Basil's testimony that Mr. Jim delivered the 1959 will to him for safekeeping was a personal transaction within the meaning of G.S. 8-51. Obviously, both Mr. Jim and Woodrow contemplated that Basil would cooperate with Mildred and assist her in the discharge of her obligations under the 1959 contract-will. However, this document imposed no legal obligation on Basil to perform personal services for Miss Pearl and Mr. Jim. Nor did it impose any obligation on Mr. Jim to devise his real property or any interest therein to Basil. Since decision is based on the ground stated below, it is unnecessary to decide whether the fact that Basil was present and saw and heard what occurred when the 1959 contract was entered into between Mildred, Mr. Jim, and Woodrow, constituted a personal transaction between Basil and Mr. Jim. In this connection, see 1 Stansbury, *supra* at § 73, p. 223.

Although a "person interested in the event" of the action is disqualified, his interest must be a "direct legal or pecuniary interest" in the outcome of the litigation. "The key word in this phrase is 'legal,' the cases as a whole showing that the ultimate test is whether the *legal rights* of the witness will be affected one way or the other by the judgment in the case. The witness may have a very large pecuniary interest *in fact*—as the interest of a wife in an important law suit to which her husband is a party—and still be competent, while a comparatively slight *legal* interest will disqualify the witness." 1 Stansbury, *supra* at § 69, p. 211, and cases there cited.

Plaintiffs do not claim ownership of Mr. Jim's property *as heirs* of their mother. They base their claim solely on the 1959 contract-will. The obligations assumed by Mildred, having been fully performed on her behalf and accepted by Mr. Jim in fulfillment of the contract until his death on 23 November 1970, plaintiffs contend the attempt by means of the (secret) 1969 will to change the disposition of Mr. Jim's real property constituted a breach of contract and, in respect of the real property, did not revoke the 1959 contract.

"[A] decree for specific performance is nothing more or less than a means of compelling a party to do precisely what he ought to have done without being coerced by a court." 71 Am. Jur. 2d, *Specific Performance* § 1, p. 10 (1973). *Accord, McLean v. Keith,* 236 N.C. 59, 71, 72 S.E. 2d 44, 53 (1952).

"It is sometimes said that the will is irrevocable in equity, but the meaning of that simply is that while equity knows that the will has been revoked, it will nevertheless decree that the property shall be held for those who would have taken if the will had not been revoked." Constigan, Constructive Trusts Based on Promises Made to Secure Bequests, Devises, or Intestate Succession, 28 Harv. L. Rev. 237, 250 (1915), quoted in *Knox v. Perkins,* 86 N.H. 66, 163 A. 497 (1932).

The foregoing impels the conclusion that the rights of plaintiffs are determinable as if Mr. Jim had died leaving a valid, probated will, in which he devised his real property in the manner set forth in the paragraph designated "FOURTH" in the 1959 contract-will. Had he done so, plaintiffs would take as *the issue* of Mildred by virtue of G.S. 31-42 (a) which provides: "Unless a contrary intent is indicated by the will, where a devise or legacy of any interest in property is given to a devisee or legatee who would have taken individually had he survived the testator, and he dies survived by issue before the testator, whether he dies before or after the making of the will, such devise or legacy shall pass by substitution *to such issue* of the devisee or legatee as survive the testator in all cases where *such issue* of the deceased devisee or legatee would have been an heir of the testator under the provisions of the Intestate Succession Act had there been no will." (Our italics.)

Plaintiffs having acquired ownership *as issue* of Mildred, Basil had no pecuniary *legal* interest in plaintiffs' real property; therefore, his testimony was not incompetent under G.S. 8-51. For the same reasons, he was not a necessary party to this action.

In *Linebarger v. Linebarger,* 143 N.C. 229, 55 S.E. 709 (1906), cited by defendants, the Court held the wife of one of the caveators, a son of the testator, was not a competent witness to declarations of the testator. Basing decision on the statute now codified as G.S. 8-51, the Court said: "It is clear that if the caveators succeeded in their contention, the husband of the witness, as one of the heirs at law, became the owner of an undivided interest in the real estate. It is well settled by a number of decisions that the wife immediately upon the seizin, either in law or deed of the husband, becomes entitled to 'an inchoate right of dower or estate in the land' of her husband. [Citations omitted.] She therefore had an interest in the property dependent upon the result of the controversy and, under the ruling in

*Pepper v. Broughton,* 80 N.C. 251, was incompetent." *Id.* at 231, 55 S.E. at 710.

In *Helsabeck v. Doub,* 167 N.C. 205, 83 S.E. 241 (1914), in the husband's action against the administrator to recover compensation for personal services rendered to the decedent, the Court held plaintiff's wife was a competent witness to declarations of the decedent. The Court noted that "the wife had no interest [within the meaning of G.S. 8-51], as upon a recovery by the plaintiff no right growing out of the married relationship would attach to the money recovered." The Court further noted that *Linebarger v. Linebarger, supra,* was "not in point, because the property in controversy was land, and the wife's inchoate right to dower attached immediately upon the recovery by her husband." *Id.* at 205-206, 83 S.E. at 241. For the reasons noted in *Helsabeck v. Doug, supra, Linebarger* is not applicable to the facts of the case we are considering.

Defendants also assign as error, based on G.S. 8-51, the admission over their objection of portions of Basil's testimony with reference to personal services he and plaintiffs performed for Miss Pearl and Mr. Jim. For the reason discussed above, this contention is without merit. In this connection, we note that Basil was cross-examined at length with reference to such services; that Mr. Jim's brother and sister, Miss Pearl's nephew, Mr. Jim's friends and neighbors, also testified to such services and to Mr. Jim's statements of satisfaction with reference thereto; and that two of the plaintiffs (Donald and Caroline) testified, without objection, with reference thereto.

Defendant also assigns as error the admission of testimony of oral statements made by Mr. Jim to various relatives and neighbors concerning the arrangement he had made for the care of himself and of Miss Pearl. This testimony, much of which was admitted without objection, was the subject of extensive cross-examination as well as direct examination. It was competent as tending to show that Mr. Jim regarded the arrangement he had made *as contractual,* as contended by plaintiffs and denied by defendants, not to prove an oral agreement. Admittedly, plaintiffs' recovery must be on the 1959 contract-will, irrespective of any variations in declarations Mr. Jim may have made to relatives and neighbors relative to the exactness of the agreement he had made.

The testimony of statements made by Mr. Jim relating to the arrangement he had made for the lifetime care of himself

---

and his wife, as well as those relating to his appreciation and acceptance of the services rendered, was competent, these statements being declarations against interest and inconsistent with a right to avoid the obligations of the 1959 contract-will. *Smith v. Perdue,* 258 N.C. 686, 129 S.E. 2d 293 (1963); *Hager v. Whitener,* 204 N.C. 747, 169 S.E. 645 (1933); 1 Stansbury, *supra* at § 147, pp. 493-499. On the other hand, the statements attributed to Mrs. Mack were self-serving declarations which, upon objection, should have been excluded.

All of defendants' remaining assignments of error have been considered. None discloses prejudicial error or presents a legal question of sufficient significance to merit discussion.

The evidence fully supported the verdict, and the judgment based thereon is in accordance with applicable law. Hence, the decision of the Court of Appeals is affirmed.

Affirmed.

Justices COPELAND and EXUM did not participate in the hearing or decision of this case.